MANUEL DE JESÚS PUBLIO DÍAZ y OTROS, demandantes y recurridos, *v.* ESTADO LIBRE ASOCIADO DE PUERTO RICO y OTROS, demandados y recurrentes.

*Número:* R-76-159 *Resuelto:* 15 de marzo de 1978

---

856

*Miriam Naveira de Rodón*, Procuradora General, *Justo Gorbea Varona*, Procurador General Interino, y *Josefa A. Román García*, Procuradora General Auxiliar, abogados de los recurrentes; *Luis A. Archilla Laugier* y *Samuel Gracia Gracia*, abogados de los recurridos; *Edward Bayouth Babilonia*, abogado del Municipio de Caguas.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

A principios del año 1970, el Departamento de Obras Públicas realizó una inspección al puente sobre el río Turabo que se encuentra en la carretera de Caguas a San Lorenzo. [1] *La misma respondía a una petición que a esos efectos hizo el Alcalde de la ciudad de Caguas, motivada por fallas externas que alcanzaban verse en la plataforma de tal estructura.* La plataforma o zona de rodaje del puente estaba dividida en varias losas, [2] y las mismas eran sostenidas por pilastras o columnas cuyos cimientos se encontraban en las márgenes y dentro de las aguas del río. Del examen realizado, se descubrió que tanto los cimientos como la mayoría de las pilastras

---

[1] Esta sinopsis de hechos pertinentes encuentra apoyo en nuestro análisis de la prueba presentada y las determinaciones del tribunal sentenciador.

[2] Por *losas* del puente, nos referimos a las diferentes secciones de superficie de hormigón reforzado, área transitable del puente por la cual se discurre. Gráficamente, las ilustramos del siguiente modo: Losa Losa Losa Losa Losa ; aunque de modo imperfecto.

del puente se habían deteriorado debido a la erosión ocasionada por las crecidas y el constante fluir de las aguas. Dada esa situación, Obras Públicas decidió comenzar de inmediato obras conducentes a su reconstrucción. Para su mejor realización, y debido al intenso tráfico vehicular de dicha vía, se construyó un desvío provisional aguas arriba. [3] Aunque el mismo fue hecho para el tránsito de vehículos y peatones, los viandantes continuaron utilizando el puente permanente en reparación. La ilustrada sala sentenciadora determinó que ello fue motivado a que no se prohibió expresamente el paso de peatones por dicho puente, y además, al hecho de que el desvío provisional no ofrecía medidas de seguridad alguna para tal uso.

Subsiguientemente, para fines de septiembre de 1970, comenzaron unas intensas lluvias sobre la zona de Caguas que provocaron la creciente del río Turabo, causando que el desvío provisional construido aguas arriba, fuese arrastrado totalmente por las fuertes corrientes. Las lluvias continuaron y el 3 de octubre de 1970, Obras Públicas suspendió toda la actividad debido a que el aumento de las aguas impedía los trabajos de reparación, máxime cuando la mayor parte eran realizados dentro del río. Poco después, [4] constantes las lluvias, se desplomó una de las losas de la plataforma del puente —la que queda al sur del río Turabo— quedando la misma en

[3] Es significativo el hecho de que el juez sentenciador no hizo mención en sus determinaciones de que Obras Públicas además había colocado avisos en ambas direcciones que contenían el mensaje de "Puente en Reparación", así como vallas que impedían el tránsito de vehículos por el lugar. (Testimonios del ingeniero Felipe de Jesús y Ramón Díaz de Jesús; E.N.P., 2, 17.)

A nuestro juicio esta omisión se debió a que el tribunal de instancia dio crédito a las declaraciones de varios testigos en el sentido de que no habían vallas ni rótulos que prohibieran el paso por el puente. (E.N.P., 11, 13.) Sin embargo, nuestro análisis de la prueba refleja que los testigos se referían a vallas y letreros que específicamente prohibieran el paso peatonal, y no a los que Obras Públicas había colocado, que sólo informaban las obras de reparación.

[4] La fecha exacta de este suceso no fue determinada, pero los testigos testificaron que ocurrió entre el 5 al 7 de octubre.

forma de "V". Esta caída cortó todo acceso para cruzar el río, y de inmediato, los vecinos y varias personas que trabajaban en dicho sector, (5) acudieron al Alcalde de Caguas para que éste remediara la condición en que se encontraba dicho extremo del puente. Ante tal reclamo y con el propósito de que estas personas pudieran continuar utilizando la vía, el Alcalde ordenó y se construyó un acceso de madera sobre las puntas en forma de "V" que por la parte superior sobresalían de la losa desplomada ( ⌐√̅T̅T̅¬ ). Como consecuencia, el acceso interrumpido fue restablecido y nuevamente usado por personas. Dicho funcionario atestó, y el tribunal le dio entero crédito, que para tal acción recibió autorización del Departamento de Obras Públicas.

Así las cosas, en la tarde del 8 de octubre, los esposos Roberto Félix Pérez Rodríguez y Rosa María Díaz García, junto a otras personas, se dispusieron a cruzar el puente para regresar de su trabajo a sus hogares. (6) Esa tarde el río se encontraba sumamente crecido y ellos tenían conocimiento de la condición precaria del puente. (7) Cuando se encontraban pasando, otra de las losas de la plataforma del puente—al norte del río—se desplomó al ceder sus columnas y éstos cayeron a las aguas crecidas del río donde lamentablemente perecieron ahogados. (8) ( ⌐√̅¬ (segundo desplome) ⊓ ).

---

(5) En las inmediaciones del lugar se encontraba el barrio Tomás de Castro, y además estaban ubicadas varias fábricas que emplean a más de 400 personas.

(6) Si bien es cierto que ese día había destacados dos policías en el sitio de los hechos, éstos no impedían el tránsito peatonal sino que lo dirigían para evitar que no se acumulara mucha gente sobre el puente.

(7) La prueba demostró que los vecinos del lugar y las personas que trabajaban por el lugar tenían conocimiento de que el puente estaba en condiciones inseguras y por ello era objeto de reparaciones. (E.N.P., 10–11, 14, 17, 18 y 19.)

(8) El cadáver de Roberto Félix Pérez Rodríguez fue localizado pero el de su esposa no pudo ser recobrado. El tribunal de instancia, luego de los procedimientos de rigor, declaró hecho indubitado el fallecimiento de la señora Díaz García.

Los familiares (⁹) de los difuntos esposos presentaron demanda en daños reclamando indemnización por sufrimientos y angustias mentales, y daños materiales (lucro cesante) contra el Estado Libre Asociado de Puerto Rico y el Municipio de Caguas. El tribunal de instancia declaró con lugar la demanda en contra del Estado y aplicando el Art. 1802 de nuestro Código Civil, (¹⁰) determinó que la causa próxima del accidente fue su negligencia al no inspeccionar el puente sobre el río Turabo por más de 50 años antes de descubrirse las fallas en 1970, lo que provocó que no se percatara a tiempo del avanzado deterioro de las columnas que lo sostenían. Fundamentó este argumento en que no se había desfilado prueba que indicara la realización de inspecciones con anterioridad al año 1970. Además, concluyó que los esposos fallecidos habían incurrido en un 50% de negligencia, ya que conociendo las condiciones precarias del puente y observando que el mismo estaba siendo afectado esa tarde por fuertes corrientes de agua, optaron por intentar pasarlo. Posteriormente, mediante Resolución Aclaratoria, plasmó su criterio de que los hechos no daban margen para responsabilizar al Municipio de Caguas.

---

(⁹) Comparecieron Manuel De Jesús Publio Díaz, padre de la fenecida Rosa María Díaz García, por sí y en representación de los hijos de los occisos, Roberto Publio y Rosa María de apellidos Pérez Díaz; Rosa María García y Pedro Publio y Luis Díaz García, madre y hermanos respectivamente de la fenecida Rosa María Díaz García.

(¹⁰) Luego de reducirlas de acuerdo a la imprudencia concurrente de los fenecidos consistente del 50%, la sala sentenciadora concedió las siguientes partidas como compensación: (a) $10,000.00 adjudicados a los herederos de los occisos, en este caso sus dos hijos, por los daños sufridos por sus padres inmediatamente antes de su muerte; (b) $80,000.00 concedidos a los mencionados hijos por los sufrimientos mentales y económicos, considerando el lucro cesante por la muerte de sus padres; (c) $5,000.00 al Sr. Manuel De Jesús Publio Díaz por los daños mentales y económicos que le causó la muerte de su hija Rosa María Díaz García y por la muerte de su hijo político Félix Pérez Rodríguez; (d) $5,000.00 a la Sra. Rosa María García por la muerte de su hija, y de su hijo político; (e) $2,000.00 a cada uno de los hermanos de la occisa por los daños mentales y económicos que significó para ellos la muerte de su hermana y de su hermano político.

A solicitud del Estado, y en consideración a los siguientes errores, expedimos auto de revisión:

"1. Erró el tribunal de instancia al concluir que el Estado Libre Asociado fue negligente al no inspeccionar el puente por unos cincuenta años y que esa fue la causa próxima del accidente.

2. Erró el tribunal de instancia al exonerar de responsabilidad al Municipio de Caguas.

3. Incidió el tribunal al concluir que no se prohibió·efectuar el tránsito por el puente en reparación.

4. Cometió error el tribunal de instancia al imponer a los demandantes sólo un 50% de negligencia.

5. Cometió error el tribunal de instancia al estimar los daños causados con motivo de la muerte del referido matrimonio."

Con excepción del último, discutiremos los errores conjuntamente.

## I

■ Ante el cuadro fáctico expuesto, es menester primeramente aclarar que la posible responsabilidad del Estado Libre Asociado no se rige por el Art. 1802 de nuestro Código Civil (31 L.P.R.A. sec. 5141)—como estimó la sala sentenciadora—sino por el Art. 404 del Código Político (3 L.P.R.A. sec. 422), que lee del siguiente modo:

"El Estado Libre Asociado de Puerto Rico será responsable civilmente de los daños y perjuicios que se ocasionen a las personas o propiedades por desperfectos, falta de reparación o de protección suficiente para el viajero en cualquier vía de comunicación perteneciente al Estado Libre Asociado y a cargo del Departamento de Obras Públicas, excepto donde se pruebe que los desperfectos de referencia fueron causados por la violencia de los elementos y que no hubo tiempo suficiente para remediarlos." [11]

---

[11] Nuestra jurisprudencia informa los siguientes casos: *Rivera* v. *Pueblo,* 76 D.P.R. 404 (1954); *Morales Muñoz* v. *Castro,* 85 D.P.R. 288 (1962); *Resto* v. *P.R. Telephone Co.,* 97 D.P.R. 313 (1969); y *Pérez Piñero* v. *E.L.A.,* 105 D.P.R. 391 (1976).

En *Rivera* v. *Pueblo,* supra, mientras un vehículo discurría por una carretera, debido a fuertes lluvias se desprendió una piedra alta de una

■ Su lectura refleja una norma de responsabilidad representativa de una excepción a la inmunidad que posee el Estado, como soberano, contra reclamaciones no autorizadas. Constituye el precepto especial a utilizarse para evaluar acciones por daños que se ocasionen a personas o propiedades en las vías públicas estatales, cuando los mismos fuesen motivados por cualesquiera de estas condiciones: 1) desperfectos; 2) falta de reparación; 3) falta de protección suficientes para el viajero. No obstante, la medida no contempla una norma de responsabilidad absoluta, pues el propio estatuto contiene como excepción de exoneración, si el Estado demuestra que

---

finca privada, y al rodar cayó sobre el vehículo destruyéndolo y lesionando a sus ocupantes. Sostuvimos inexistencia de responsabilidad del Estado y dijimos: "Aparte de que el desprendimiento de la roca se debió, según lo encontró probabo el Tribunal a quo, a la violencia de los elementos—las fuertes lluvias que cayeron el día del accidente—lo que quizás sería suficiente para exonerar de responsabilidad al demandado, no puede imputársele negligencia a éste por el hecho de que no previera la posibilidad del desprendimiento de la roca." (408).

En *Morales Muñoz* v. *Castro*, supra, un conductor de un vehículo y sus acompañantes sufrieron daños al llegar a un desvío en un tramo de carretera en construcción que estaba desprovisto de avisos adecuados sobre las condiciones del lugar. Confirmamos la sentencia del tribunal de instancia imponiendo al Estado responsabilidad bajo el Art. 404 del Código Político, así como su dictamen responsabilizando también al contratista de la obra por su negligencia, y al conductor del vehículo por conducirlo a 60 millas por hora.

En *Resto* v. *P.R. Telephone Co.*, supra, la compañía telefónica contrató los servicios de Anastacio Ortiz para la poda de unos árboles. Luego de realizar su trabajo Ortiz dejó una rama parcialmente sobre la carretera pública. La misma permaneció allí por aproximadamente treinta días, lo cual era tiempo suficiente para que el Estado la hubiese removido. Así las cosas, mientras el demandante caminaba cerca de la carretera, un automóvil impactó la rama y ésta lo lesionó. Confirmamos un dictamen declarando con lugar la demanda en daños y perjuicios contra la Compañía de Teléfonos y contra el Estado. La responsabilidad de este último basada en el Art. 404 del Código Político.

Recientemente en *Pérez Piñero* v. *E.L.A.*, supra, sostuvimos una sentencia que le impuso responsabilidad al Estado bajo el citado Art. 404 en un caso en que mientras un camión descargado discurría por una carretera, el pavimento se hundió súbitamente, resultando el vehículo en una pérdida total. Anotamos que debido a criterios disímiles y a una ponencia disidente a la que se unieron dos magistrados, en este caso no hubo propiamente *Opinión del Tribunal*.

tales desperfectos fueron motivados por la violencia de los elementos y no hubo tiempo suficiente para remediarlos.

 Al observar y comparar con detenimiento el contenido del Art. 404 con el 1802, si bien son diferentes, detectamos cierta tangencia entre las obligaciones que ambos exigen. En efecto, nos percatamos que las condiciones de peligro que deben existir en la vía pública para que el Estado responda con arreglo al 404 por los daños que se ocasionen debido a las mismas, constituyen una violación al deber de previsibilidad exigido por el segundo. Demostrado que el Estado tiene conocimiento o que pudo prever la existencia de una de esas condiciones, y tuvo tiempo razonable para remediarlas—en ausencia de evidencia sobre violencia de elementos—sería responsable por los daños. Cabe mencionar que la eximente provista en el Art. 404 también la encontramos en los conceptos de "caso fortuito o fuerza mayor", [12] excluyentes de responsabilidad bajo el 1802. Obviamente, los inusitados efectos de la naturaleza a que se refiere el primero al consignar la "violencia [13] de los elementos", [14] son parte integral del concepto "fuerza mayor" [15] del segundo.

---

[12] Tales conceptos emergen del Art. 1058 de nuestro Código Civil (31 L.P.R.A. sec. 3022) que contiene la norma de que "nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables." Véanse: *Ramos* v. *Carlo*, 85 D.P.R. 353 (1962); *Rivera* v. *Caribbean Home Const. Corp.*, 100 D.P.R. 106 (1971).

[13] Se define *"violencia"* como algo que está fuera de su natural estado, situación o modo; que obra con ímpetu y fuerza. Vox: *Diccionario General Ilustrado de la Lengua Española*, Tercera Ed., Editorial Bibliograf (1976).

[14] *"Elementos"* era el nombre dado por los antiguos a la tierra, al aire, al agua y al fuego, . . . . Vox: *Diccionario Ilustrado de la Lengua Española*, Tercera Ed., Editorial Bibliograf (1976).

[15] Hace más de medio siglo que contemplamos como ilustrativo de caso fortuito o fuerza mayor, los inusitados efectos de la naturaleza. A esos efectos en *Vidal & Cía., S. en C.* v. *Am. R.R. Co.*, 28 D.P.R. 204, 210 (1920), expresamos: "Fuerza mayor es el acontecimiento que no hemos podido precaver ni resistir, como por ejemplo la caída de un rayo, el granizo, la inundación, el huracán, la irrupción de enemigos, el acometimiento de ladrones . . . y es caso fortuito el suceso inesperado o la fuerza mayor que no

En consecuencia, aunque el legislador al aprobar el Art. 404 dispuso una norma especial para regir estos casos, en el aspecto que nos ocupa, ajustó su alcance al provisto por el Art. 1802.

## II

Con este trasfondo debemos considerar los méritos del recurso. De los hechos no contradichos surge claramente que tan pronto Obras Públicas es advertido y constata los desperfectos del puente, de inmediato comienza a repararlos. Como vía de acceso alterna construyó otro puente provisional, para vehículos y peatones, sin embargo no prohibió su uso por estos últimos a través del que se reconstruía. Fuertes lluvias provocaron la suspensión total de las obras el día 3 de octubre de 1970 por decisión del ingeniero de Obras Públicas, Felipe De Jesús Ortiz, quien se personó al lugar y observó la alta inestabilidad en que se encontraba la estructura debido a las recias corrientes del río. En su testimonio aceptó que los daños eran de tal magnitud que no había seguridad para los viandantes. (E.N.P., 7.) Destruido el puente provisional, se continuó usando el que se reparaba, hasta que una de sus partes (losa) cae, en cuyo momento, el Municipio establece una plataforma de paso de madera como paliativo inmediato a sus usuarios. La desgracia ocurre al desplomarse subsiguientemente otra losa.

No coincidimos con la conclusión del tribunal a quo de que la causa próxima del accidente fue la negligencia del Estado en no inspeccionar por cincuenta años el puente. En la cadena de hechos relatados, tal omisión constituyó un eslabón que dejó de tener materialidad. Aceptada la existencia de los desperfectos—fueran como consecuencia de los embates del tiempo en años anteriores o el resultado de efectos más recientes

---

se puede precaver ni resistir . . . . Tales son las inundaciones, torrentes, naufragios, incendios, rayos, violencias, sediciones populares, ruinas de edificios causadas por alguna desgracia imprevista y otros acontecimientos semejantes."

—el hecho cierto es que se estaban reparando antes de que ocurriera el accidente, y que debido a la violencia de los elementos, no pudieron arreglarse oportunamente para remediar la condición de peligrosidad que ofrecía. Sin embargo, la responsabilidad del Estado se origina en que conociendo la inseguridad, fragilidad y deterioro del puente, debió, como única medida precautoria adecuada, prohibir terminantemente su uso a peatones. Resulta significativo que éste no adujo evidencia que demostrase la imposibilidad de adoptar esta medida de prevención mediante la simple erección de rótulos advirtiendo el riesgo y peligro eminente de derrumbamiento—prohibiendo de manera absoluta el paso—y colocando unas vallas que efectivamente obstaculizaran el acceso. ([16]) Aun bajo el supuesto de que Obras Públicas hubiese colocado avisos en el lugar con el mensaje "puente en reparación", ([17]) los mismos, dada su situación precaria, no constituían advertencia suficiente sobre el peligro que conllevaba el transitar por él. ([18]) Es esta omisión del Estado, conjuntamente con la presencia de dos policías en cada uno de los extremos del puente dirigiendo el paso, y la autorización concedida al Municipio para la construcción de un pasadizo sobre las puntas en "V" de la primera losa que se desplomó, las que infringieron la norma del Art. 404, *supra*, y propiciaron parcialmente la ocurrencia del accidente en que perdieron la

---

([16]) Véanse: *Miller* v. *State*, 177 N.Y.S.2d 918; *Battistoni* v. *State*, 149 N.Y.S.2d 614. En esos casos se expuso en síntesis, que cuando se construye una vía pública por el Estado, éste debe tomar las medidas necesarias para proteger a los que transitan por ella, poniendo avisos adecuados, o si es necesario, por no ser la vía de comunicación razonablemente segura, cerrando la misma al público.

([17]) Nota (3).

([18]) Según se expone en Blashfield, *Automobile Law and Practice*, Tercera Ed., Vol. 4, Sec. 164.10 (pág. 425)—"Cuando se colocan advertencias adecuadas al comienzo del área objeto de construcción, no es necesario colocar avisos específicos en el lugar sobre defectos u obstrucciones; *pero las circunstancias pueden ser tales que resulte insuficiente la mera advertencia general del hecho de que la carretera está siendo construida.*" (Bastardillas y traducción nuestras.)

vida los esposos Pérez-Díaz. Bajo dicho precepto, el Estado no descargó su responsabilidad primaria de ofrecerle seguridad a los que transitaban por dicha vía, aun cuando ésta estaba bajo construcción: *Morales Muñoz* v. *Castro*, supra.

La anterior conclusión no releva al Municipio de responsabilidad. Este fue negligente al no prever, teniendo conocimiento, que era sumamente probable que dadas las condiciones de alta inestabilidad en que se encontraba el puente, podía repetirse que otra losa se desplomara por efectos del embate de las aguas. El Municipio estaba informado de la grave situación existente en el lugar (E.N.P., 18, 19, 20) y del alto indicio de la peligrosidad de la estructura. Su acción de construir el acceso de madera representó una invitación a los transeúntes para que lo siguieran utilizando en momento en que la prudencia y circunspección aconsejaban su prohibición total. La autorización del Estado no le releva ya que actuó para beneficio de los vecinos y usuarios del lugar asumiendo a la par las consecuencias de la acción. En ausencia del acceso de madera, ninguna persona hubiese podido intentar cruzar a través del puente. Apreciado en su justa perspectiva, valoramos la negligencia del Estado y el Municipio en un veinticinco (25%) por ciento cada uno.

En el presente cuadro de hechos, los esposos Pérez-Díaz también incurrieron en conducta negligente que contribuyó a tan deplorable resultado. Era de conocimiento de todos los vecinos así como de los que trabajaban por el lugar, las condiciones defectuosas del puente. La inestabilidad de la estructura y el peligro que conllevaba utilizarla con las aguas crecidas del río era evidente. Al transitar sobre el puente, asumieron el riesgo visible que ello conllevaba. No alteraremos la imposición de cincuenta (50%) por ciento de negligencia formulada por la sala sentenciadora.

■ Resolvemos que las causas próximas del accidente fueron la falta de protección suficientes para el viajero que

imperaba en la vía de comunicación perteneciente al Estado Libre Asociado—no prohibiendo su uso; la negligencia del Municipio de Caguas al construir el acceso de madera sin prever que era probable que el puente en todo o en parte nuevamente se desplomase; y la negligencia concurrente de los occisos al no prever la misma consecuencia, teniendo conocimiento del deterioro del puente. [19]

## III

Resta determinar la valoración de daños que se impugnan a la luz de los siguientes señalamientos: 1) excesiva la partida en concepto de "lucro cesante" adjudicada en virtud de un informe preparado por un economista, donde se predice el valor monetario actuarial estimado de los esposos Pérez-Díaz, por el fundamento de que la fórmula utilizada por el perito conflije con nuestro pronunciamiento en *Vda. de Seraballs* v. *Abella Hernández*, 90 D.P.R. 368, 370 (1964); 2) que del ingreso anual estimado de los causantes no se restó la correspondiente contribución sobre ingresos, según dispone el citado caso; y 3) exagerada la cantidad concedida a los hijos de los causantes por los daños morales sufridos por éstos momentos antes de morir.

En *Urrutia* v. *A.A.A.*, 103 D.P.R. 643 (1975), reconocimos la difícil tarea de aquilatar daños, por no existir ". . . tabla o computadora electrónica que recoja todos los elementos y premisas inarticuladas que nutren la valoración del dolor físico y mental humano y permita, mediante la aplicación de unas teclas o el oprimir unos botones, obtener el resultado final apropiado. Esta función descansa sobre el ejercicio discrecional prudente, juicioso y razonable del juzgador

---

[19] Según dijimos en *Morales Muñoz* v. *Castro*, supra: "La causa próxima de un accidente puede deberse a la negligencia de una o más de las partes envueltas en el mismo. *Cruz et al.* v. *Frau*, 31 D.P.R. 92 (1922). Si más de una fue negligente y el accidente se debió a la concurrencia de ambas negligencias, las dos partes son responsables de los daños causados."

de hechos animado por un sentido de justicia y de conciencia humana. El contacto con la prueba presentada en el proceso judicial de primera instancia y las impresiones derivadas de la apreciación visual del juez, es la razón básica para que en ausencia de un dictamen imponiendo una cuantía ridículamente baja o exageradamente alta, a la luz de la prueba sobre daños presentada, en nuestra función apelativa, implementemos la norma de abstención judicial fundada en criterios de estabilidad y de respeto a los tribunales de primera instancia. Empero, señaladas y sometidas a nuestra consideración circunstancias comprobadas que ameritan una modificación de la cuantía, procederemos a ello siguiendo los criterios antes mencionados." (647).

■ Con esta perspectiva presente, veamos los méritos de los planteamientos. Bajo el estado del derecho vigente, los demandantes son acreedores a que los demandados les sastisfagan el importe de la pérdida que sufrieron por la muerte de los occisos. Esa pérdida se mide a base del valor presente de los ingresos probables que los occisos hubiesen generado durante el resto de sus vidas productivas. Los gastos personales estimados que hubiesen tenido los occisos se deducen de esos ingresos y el balance representa la pérdida económica que se traduce en daños. En el caso de autos se cuestiona la partida ya que los demandantes recurridos no dedujeron la contribución sobre ingresos que los occisos hubiesen tenido que aportar, si hubiesen recibido dichos ingresos.

En *Vda. de Seraballs* v. *Abella,* supra, descontamos las partidas de esas contribuciones al determinar la pérdida económica sufrida por los allí reclamantes. Sin embargo, subsiguientemente, en los casos de *Rodríguez* v. *Ponce Cement Corp.,* 98 D.P.R. 201 (1969) y *Sánchez* v. *Liberty Mutual Ins. Co.,* 100 D.P.R. 1 (1971), nos abstuvimos de realizar dicha deducción. Y en *Rodríguez,* supra, expresamos lo siguiente con relación a este cambio doctrinal:

". . . Si algún reparo tiene [la demandada] es que de los ingresos anuales del demandante [no] [20] se redujo una cantidad representativa de la contribución de ingresos que presumiblemente le correspondería satisfacer. La mayoría de la doctrina americana rechaza esta deducción en las acciones por lesiones personales, Anotación, *Propriety of taking income tax into consideration in fixing damages in personal injury or death action*, 63 A.L.R.2d 1398, Sec. 4 [a]; *Income Tax as a Factor in Measuring Personal Injury Awards*, 8 Ark. L. Rev. 174 (1954); 16 NACCA L.J. 212 (1955). Véase Sec. 22(b) (5) de la Ley de Contribución sobre Ingresos, 13 L.P.R.A. sec. 3022(b) (5)." 219–220.

▇▇▇ Hemos reexaminado la doctrina. Tanto ayer como al presente, la mayoría de tribunales que la sostienen estiman que la deducción de contribuciones es de naturaleza especulativa. Sin embargo, una vez reflexionemos sobre el particular, encontramos que el argumento carece de fuerza persuasiva, pues resulta evidente que dicha contribución tiene el mismo grado de elemento especulativo que posee el "lucro cesante"; el denominador común es el mismo. Ante la contención de la parte recurrente, y a los fines de despejar cualquier duda al respecto, reiteramos la regla de que al estimarse la pérdida económica relacionada con el "lucro cesante" no debe deducirse la contribución.

▇▇▇ La Sec. 22(b) (5) de la Ley de Contribuciones sobre Ingresos—Núm. 91 de 29 de junio de 1954, según enmendada—excluye del ingreso bruto y exime de contribución "el monto de cualquier indemnización recibida, en procedimiento judicial o en transacción por . . . lesiones o enfermedad . . . ." (13 L.P.R.A. sec. 3022(b) (5).) Reconocemos que el lucro cesante puede surgir como consecuencia de lesiones o enfermedad, pero también puede nacer de otras causas, como el incumplimiento de contrato, etc. Cuando en una acción se

---

(20) La palabra "no" que hemos intercalado aparentemente fue omitida por error. La demandada no iba a tener reparos si al ingreso se le deducía la contribución. Es contra la no deducción de la contribución que un demandado hace reparos.

indemniza el lucro cesante, éste es un elemento de daño que se concede porque las actuaciones del demandado ocasionaron una interrupción y cese de ingresos. Propiamente hablando, no es una indemnización por lesiones o enfermedad ya que éstas tienen el propósito básico de restaurar el daño físico causado, pero como no puede hacerse en especie, se sustituye con dinero. *Robles Ostolaza* v. *U.P.R.*, 96 D.P.R. 583 (1968). Bajo este razonamiento, la indemnización por lesiones o enfermedad no constituye ingresos, y en el diseño fiscal prevaleciente, es de justicia que la Ley de Contribuciones sobre Ingresos así lo reconozca.

■ Pero la indemnización del lucro cesante causado por una lesión o enfermedad, no tiene como objetivo el restituir o sustituir la integridad física de la persona. Sustituye ingresos provenientes del trabajo, que son tributables. La Ley de Contribuciones sobre Ingresos no exime la indemnización del lucro cesante del pago de contribuciones. Esta interpretación guarda correspondencia con la regla de hermenéutica que dispone que las exenciones y deducciones contributivas se interpretan restrictivamente: *PARDAVCO, Inc.* v. *Srio. de Hacienda*, 104 D.P.R. 65, 73 (1975); *West India Mach.* v. *Srio. de Hacienda*, 89 D.P.R. 115, 125 (1963); *Descartes, Tes.* v. *Tribl. de Contribuciones y Ortiz*, 73 D.P.R. 491, 497 (1952). Es razonable concluir que tanto el ingreso derivado del trabajo, como su sustituto en indemnización, son ingresos tributables. Véase *Hodge* v. *C.I.R.*, 64 T.C. 616 (64.62 P-HTC) (1975).

■ En consecuencia, estando sujeta a contribución sobre ingresos la indemnización que un reclamante reciba en concepto de lucro cesante en una acción de daños, (21) sería injusto que a esa compensación se le reduzca a favor del demandado, suma alguna atribuíble a contribuciones; máxime ante

---

(21) Nada impide que los tribunales de primera instancia, al conceder daños de esta naturaleza, a los fines pertinentes, remitan al Departamento de Hacienda copia de sus sentencias.

la realidad de que ello equivaldría a una doble tributación. No procede la impugnación de la partida por lucro cesante.

■ El tribunal sentenciador agrupó las partidas de daños físicos y mentales de los hijos con la de lucro cesante en la suma de $160,000.00. Teniendo en mente el anterior pronunciamiento y atendidas todas las circunstancias concurrentes, consideramos como indemnización adecuada la cantidad de $15,000.00 a cada hijo por las angustias y sufrimientos mentales que les produjo la muerte de sus padres. En cuanto a los daños económicos causados a éstos (lucro cesante), advertimos que la fórmula seguida en *Vda. de Seraballs,* supra (370), no pretende exponer de manera absoluta todos los criterios matemáticos a tomarse en cuenta, sino aquellos comunmente reconocidos. La razonabilidad de la cuantía total no puede hacerse depender de unos cómputos aritméticos, que en fin de cuentas se elaboran sobre unas bases y expectativas, que aunque precisables, no están inmunes de cierto grado de especulación. Díaz Asencio y Zayas Puig; *Seraballs* v. *Abella: La Determinación de Daños y las Tablas Actuariales,* Nota, XXXIV Rev. Jur. U.P.R. 251 (1965). En el caso de autos, entendemos que el valor justo por este concepto es la suma de $100,000.00 ($50,000.00 por cada progenitor). Respecto a la indemnización concedida a los padres de la occisa, estimamos como compensación razonable a cada uno $5,000.00; y una compensación de $2,000.00 a cada uno de los dos hermanos de la fenecida.

■ Finalmente, examinemos el señalamiento relativo al resarcimiento que corresponde a los hijos, en su condición de herederos de los causantes, por concepto de los daños físicos y mentales que éstos experimentaron momentos antes de morir. Su génesis doctrinaria la encontramos en la decisión de *Vda. de Delgado* v. *Boston Ins. Co.,* 101 D.P.R. 598 (1973), en que resolvimos que una persona que fallece víctima del acto u omisión negligente de otra, transmite a sus herederos la causa

de acción que no ejercitó, siendo recobrable una compensación al sufrimiento físico y moral que precedió a su deceso. Al formular esta norma, indicamos que la reparación del daño debe representar una ". . . indemnización pecuniaria como justo valor . . . ." 606. Ante la inexorable realidad de que todo ser humano algún día ha de morir, (²²) confesamos una vez más las limitaciones y lo angustioso de la gestión judicial de valorar este tipo de daños; sin embargo, apuntamos que factores tales como la naturaleza y extensión de las lesiones; lapso de tiempo transcurrido entre la ocurrencia del daño y la muerte; estado de lucidez o conciencia de la víctima; disponibilidad o no de asistencia y medicamentos adecuados; tipo de tratamiento recibido; presencia o ausencia de familiares; y cualquier otra circunstancia pertinente, son determinantes para la evaluación de la cuantía. Y sobre todo, debemos recordar la sabiduría de la frase, de autor anónimo, de que "[l]a muerte de un ser querido, más que de él es nuestra, puesto que nosotros la vivimos."

En el contexto de los hechos del caso, es razonable concluir que los sufrimientos físicos y mentales de los esposos Pérez-Díaz, momentos antes de su deceso, fue por un corto período de tiempo. Cayeron desafortunadamente en las corrientes crecidas del río y por un pequeño lapso de tiempo pidieron auxilio, pero rápidamente desaparecieron en las aguas. (E.N.P., 16.) No nos enfrentamos en este caso a la situación en que las víctimas padecen por un largo período de tiempo de dolores físicos, sufrimientos mentales y aflicciones en la penosa espera de la extinción de sus vidas. Estamos frente a la ocurrencia de una muerte bastante súbita, que si bien en su epílogo fue angustiosa y exasperante, conllevó el natural sufrimiento de todo ser humano al enfrentarse a su

---

(²²)"Ignoramos cuándo ha de llegar la hora de nuestra muerte, pero todos estamos completamente seguros de que ha de llegar algún día." *Amy* v. *Registrador*, 21 D.P.R. 123, 128 (1914).

partida. Consideramos que debe reducirse a $5,000.00 los sufrimientos de cada uno de los causantes. (²³)

A la luz de lo expuesto, *se dictará Sentencia modificando la del Tribunal Superior, Sala de Caguas en lo que respecta a los siguientes pronunciamientos: a) Determinándose una negligencia del Estado Libre Asociado de Puerto Rico y del Municipio de Caguas en 25% cada uno, y el remanente a Roberto Félix Pérez Rodríguez y Rosa María Díaz García; b) aplicados los por cientos de negligencia comparada, condenándose a los demandados a satisfacer solidariamente la suma total de $77,000.00 a las siguientes personas: (1) a cada uno de los menores Roberto Publio y Rosa M. de apellidos Pérez Díaz, $7,500.00 en concepto de angustias mentales propias; $25,000.00 por lucro cesante; y $2,500.00 por las angustias mentales de sus causantes (estas sumas a ser consignadas en el tribunal por ser ambos menores de edad); (2) a cada uno de los padres de Rosa M. Díaz García, nombrados Manuel De Jesús Publio Díaz y Rosa M. García, la suma de $2,500.00; y (3) la cuantía de $1,000.00 a sus hermanos Pedro Publio y Luis Díaz García.*

El Juez Presidente Señor Trías Monge concurre en el resultado a que se llega en las partes I y II, pero disiente sin opinión de la parte III. El Juez Asociado Señor Díaz Cruz disintió en parte con opinión separada. El Juez Asociado Señor Rigau no intervino.

---

(²³) Compárese con la compensación de $15,000.00 concedida en *Vda. de Delgado,* supra, en que el "causante sufrió extensas quemaduras [graves en ¾ partes del cuerpo] que le mantuvieron en condición crítica, angustiosa y desesperada por tres días sufriendo a plena conciencia . . ." 607. Y en *Zeno Molina* v. *Vázquez Rosario,* 106 D.P.R. 324 (1977), indicamos la improcedencia de una partida bajo este concepto cuando la víctima muere instantáneamente.

—o—

Voto disidente, en parte, del Juez Asociado Señor Díaz Cruz.

San Juan, Puerto Rico, a 15 de marzo de 1978

Difiero de la opinión en la parte que impone 25% de culpa al Municipio de Caguas, modificando la sentencia al efecto. El Alcalde de Caguas actuó a ruego de los vecinos al instalar el acceso provisional de madera. No considero su acto una "invitación" a seguir usando el puente en reparación, sino ineludible respuesta y atención al urgente reclamo de los vecinos del barrio "Tomás de Castro" en sus necesidades de movilidad y comunicación, y las de 400 personas empleadas por varias fábricas establecidas en dicho sector.

Además, la intervención del Municipio corrigiendo con una tapa de madera la condición de inminente peligro que representaba el hueco dejado por la plancha caída, con la previa aprobación del Estado, de ningún modo puede tomarse como detrimental para éste, sino lo contrario, por lo que no debe dar lugar a traslado al Municipio de la responsabilidad primaria del Estado bajo el Art. 404 del Código Político (3 L.P.R.A. sec. 422).

La mayoría penaliza al Municipio por brindar algún grado de seguridad a los vecinos que demandaban un remedio. Me imagino que también le hubiese impuesto responsabilidad si probado que teniendo los medios y recursos para tapar el peligroso hueco, hubiese puesto oídos sordos al reclamo de los residentes, permitiendo con su inacción que alguien cayera al río. ¿O es que para proteger sus escasos recursos de una demanda, venía el Municipio obligado a permanecer impasible como un Buda, indiferente a la angustia de sus residentes?