# 2006 DTA 110

**TRIBUNAL DE APELACIONES**
**REGIÓN JUDICIAL DE PONCE**
**(PANEL X)**

LUIS A. MARTÍNEZ ARCA Y MIRLA M. RODRÍGUEZ MARÍN
Recurridos

v.

VEN-LOUR ENTERPRISES, INC., LC REAL ESTATE, DESARROLLADORA CARIBE, S.E., SATISFACTION REALTY & INVESTMENT (SARI)

Núms. Cons. KLRA-06-00056 / KLRA-06-00059 / KLRA-06-00060

San Juan, Puerto Rico, a 25 de agosto de 2006

Panel integrado por su Presidente, el Juez Brau Ramírez,
y los Jueces Colón Birriel y Hernández Torres

Hernández Torres, Jueza Ponente

## TEXTO COMPLETO DE LA RESOLUCIÓN

Comparecen ante nos, los recurrentes, LC Real Estate, Inc., Desarrolladora Caribe, S.E. (en lo sucesivo, Caribe), Satisfaction Realty & Investment, Corp. (en lo sucesivo, SARI) y Ven Lour Enterprises, Inc. (en lo sucesivo, VLEI), solicitando que revoquemos una Resolución del Departamento de Asuntos del Consumidor, en adelante D.A.C.O., mediante la cual ordenó, a las recurrentes solidariamente, al cumplimento específico de los contratos otorgados originalmente, honrando el precio final pactado de $175,000.00, reservar la unidad que fue separada u otra similar, conforme indicado en el negocio jurídico; y exclusivamente a VLEI, le ordenó el pago de $4,000.00 por concepto de daños y perjuicios ocasionados por su incumplimiento de contrato y por el contrato en daños de tercero.

Los hechos relevantes al asunto ante nos son los siguientes.

### I

Según se desprende de las determinaciones de hechos del D.A.C.O., Luis Ángel Martínez Arcela y su esposa Mirla Mireya Rodríguez Marín, en adelante los recurridos, presentaron una Querella el 7 de agosto de 2002. En la misma, alegaron que le entregaron a LC Real Estate, Inc. (empresa de bienes raíces contratada por VLEI para vender la última etapa del proyecto Estancias del Gulf Club) la suma de $800.00 para separar, con opción a compra, la propiedad DA-21 ubicada en dicho proyecto. Los recurridos poseían ya, su primera residencia en dicho proyecto.

En ese entonces, VLEI era la dueña en pleno dominio del inmueble (sito en Ponce) donde ubica el complejo de viviendas denominado Estancias del Gulf Club. Era, a su vez, la desarrolladora de todas las fases de dicho proyecto de viviendas, incluyendo esta última etapa o fase que consistía en la construcción de 49 unidades de

vivienda. Su presidente y mayor accionista lo era el ingeniero José Miguel Ventura Asilis.

El 25 de septiembre de 2002, los recurridos firmaron, ante una representante de LC Real Estate, Inc., el contrato uniforme de compraventa. En dicho contrato, las partes pactaron la compraventa de una propiedad que consistía de: 2 plantas, sala, comedor, cocina, 4 habitaciones, 3½ cuartos, *"family room"*, lavandería y doble marquesina, en un solar de 325.00 metros cuadrados; por el precio de $175,000.00. La parte vendedora, VLEI, se comprometió a entregar la unidad opcionada en 18 meses, contados a partir de la firma de este contrato. La representante de LC Real Estate, Inc., retuvo el contrato para conseguir la firma de VLEI y luego enviarle copia del mismo a los recurridos, lo cual nunca hizo. No fue hasta el 11 de junio de 2004 que los recurridos recibieron una copia del contrato de compraventa, vía fax, ilegible y sin firmar por parte de VLEI.

El 23 de julio de 2003, los recurridos recibieron una carta de LC Real Estate, Inc., informándoles que habían cesado el mercadeo del proyecto aquí en controversia, debido a que VLEI lo estaba vendiendo (el proyecto) a otro constructor. Indicaba, que dicho proceso de venta demoraba y era incierto, pues no sabían que iban a construir en los lotes existentes, ni creían que se honrarían las reservaciones. Dicha carta vino acompañada de una Hoja de Cancelación para que fuera firmada y devuelta a LC Real Estate, Inc., y así poder procesar la devolución del depósito dado por los recurridos. Esta carta fue enviada por correo regular. Véase recurso de Caribe, a la pág. 279.

**No obstante lo antes esbozado por LC Real Estate, Inc. en su carta, la referida hoja de cancelación disponía que los recurridos deseaban cancelar la compra:** *"[d]ebido a la demora en comenzar la construcción. Por tal motivo solicitamos se nos devuelva la totalidad del dinero depositado"*. **(Énfasis y subrayado en el original.)** *Ibid.*, **a la pág. 278.**

Inconformes lo recurridos, se comunicaron y visitaron las oficinas de LC Real Estate, Inc., indicando que no estaban de acuerdo con la carta y que no aceptaban la rescisión del contrato suscrito ni la devolución del dinero. Le solicitaron a la representante de LC Real Estate, Inc. y ésta lo aceptó, que todos sus documentos, unido al dinero del depósito le fueran enviado al nuevo desarrollador.

Mientras tanto, el 6 de abril de 2004, VLEI y Caribe suscribieron un Contrato de Opción de Compra. Mediante dicho contrato, el primero se comprometía a venderle a la segunda los 49 solares con sus permisos para desarrollarlos por la suma de $1,982,585.00. Con la firma de este contrato, Caribe le entregó a VLEI la suma de $10,000.00, como pronto pago. Firmaron el referido contrato, por VLEI su presidente, el señor Ángel Cintrón, y por Caribe su socio gestor, el ingeniero José M. Bonnin. Se pactó, además, el pago de ciertas deudas por parte de VLEI, con dineros provenientes del precio de venta y el compromiso de indemnizar a Caribe por cualquier gasto que incurriera como resultado de toda reclamación que pudiera presentar cualquier tercero. En dicho documento se indicó que (entre VLEI y LC Real Estate, Inc.) existía un contrato con un corredor de bienes raíces y se acordó que el mismo no sería asumido como parte de este acuerdo y Caribe informó que procedió a firmar contrato de corretaje con Abraham García contingente a la realización del desarrollo.

En mayo de 2004, los recurridos recibieron un folleto (*"brochure"*) de la recurrente SARI, en mayo de 2004, ofreciendo en venta la última fase de 49 residencias del proyecto aquí en controversia. SARI fue la nueva empresa de bienes raíces contratada por Caribe; la nueva desarrolladora que adquirió esta última fase. En su carta, SARI indicaba que las residencias serían de 3 (muy fácilmente) convertibles en 4 cuartos dormitorios, de 3½ baños, y que contarían con terminaciones muy elegantes, como por ejemplo topes de granito en la cocina.

Durante dicho mes de mayo de 2004, SARI, por voz de su presidente, Abraham García, llamó a los recurridos para ofrecerle la residencia por el precio de $225,000.00 y un pronto de $5,000.00. Acto seguido, los recurridos le indicaron que continuaban interesados en la residencia, que poseían un contrato de compraventa desde 2002, que habían separado la residencia mediante el pago del referido depósito, y que tenían que honrarle el contrato. Finalmente, le solicitaron al señor Abraham García que les reservara la residencia hasta que se resolviera este

asunto. El señor Abraham García no aceptó.

Así las cosas, el 16 de junio de 2004, VLEI presentó ante el Tribunal de Primera Instancia, Sala Superior de San Juan, una Petición solicitando consignar el depósito dado por los recurridos. Aducían en su solicitud, que debido a la ausencia del principal accionista tuvo pérdidas económicas significativas teniendo el efecto de paralizar la construcción, que en varias ocasiones trató de comunicarse con los recurridos para resolver el contrato y devolverles el dinero del depósito, resultado todas infructuosas; que envió carta certificada el 2 de diciembre de 2003, notificando la resolución de contrato y devolviendo el depósito de los recurridos, siendo ésta devuelta; que luego de dicha devolución, intentó comunicarse con los recurridos, no consiguiendo realizar alguna gestión en cuanto a la devolución del depósito; y que interesaba consignar, toda vez no tenía contacto alguno con los recurridos. La suma consignada fue $800.00.

En junio de 2004, los recurridos reciben copia de la anterior petición con copia de la carta certificada, momento en que advinieron en conocimiento del envío y contenido de la misiva. En dicha carta, VLEI informaba que por razones fuera de su control, condición económica, ausencia inesperada del principal accionista y oficial, no podían continuar el desarrollo de Estancias del Golf Club. Adjunto con dicha carta le había enviado un cheque por la suma de $800.00, como devolución del depósito.

El 8 de julio de 2004, los recurridos presentaron la querella que nos ocupa, alegando los hechos hasta aquí narrados. Además, solicitaban los siguientes remedios: el cumplimiento estricto del contrato, garantía del contrato, garantizando el precio de compraventa acordado por la residencia; $175,000.00; se les honrara el depósito de $800.00 para separar la misma; se le ordenara al nuevo desarrollador honrar el mismo bajo las mismas condiciones establecidas en el contrato; que se le ordenara a Caribe y SARI reservar una unidad a los recurridos para, en caso de prevalecer, no se vieran imposibilitados de adquirir la misma; daños y perjuicios más intereses devengados por depósito desde el 7 de agosto de 2002; y que se le ordene a LC Real Estate, Inc., remitirles una copia del contrato y todo documento referente al caso de la compraventa por correo.

Oportunamente, LC Real Estate, Inc., Caribe, SARI y VLEI contestaron la anterior querella. Estos, en esencia, negaron lo alegado por los recurridos, trabándose así la controversia de autos.

Posteriormente, el 28 de enero de 2005, VLEI y Caribe suscribieron un Acuerdo. Dicho acuerdo tenía como objeto, facilitar y viabilizar la consumación de la compraventa pactada en la anterior opción. En dicho documento, además de ratificar el contrato de opción antes celebrado en todo aquello que no fuera expresamente modificado por éste, Caribe pactó la compraventa de 2 solares adicionales por la suma de $306,000.00, pagando $20,000.00 por el derecho de opción.

Luego, el 16 de marzo de 2005, las partes suscribieron otro Acuerdo para suplementar este acuerdo. En este segundo acuerdo compareció como tercera parte José Miguel Ventura Asilis y su esposa Josefina Abréu Cisnero, representados por el señor Alfredo Cintrón Cintrón. El mismo, tuvo como propósito garantizar el pago de la relocalización de tuberías dañadas por un tercero, que no fueron presupuestadas en el primer acuerdo, y pago de un embargo en aseguramiento de sentencia presentado que gravaba la finca donde ubicaban los 49 lotes objeto de la compraventa. La escritura de compraventa fue otorgada ese mismo 16 de marzo de 2005.

El 25 de abril de 2005, el D.A.C.O. celebró la vista administrativa de rigor, emitiendo su Resolución el 14 de noviembre de 2005, notificada el 28 de noviembre de 2005. En su resolución, el foro administrativo, además de lo antes reseñado, determinó que la falta de firma por parte de algún representante de VLEI reflejaba falta de diligencia, deficiencia e irregularidad para mantener el expediente de los recurridos; que los recurridos en ningún momento solicitaron rescindir el contrato ni presionaron para que se le entregara la propiedad; que VLEI no hizo ninguna otra gestión para notificar adecuadamente a los recurridos su intención de rescindir el contrato de compraventa de Estancias del Golf Club, excepto la carta certificada del 2 de diciembre de 2003; que desde el 2

de diciembre de 2003 hasta el 21 de junio de 2004, VLEI no hizo gestión alguna para notificarle a los recurridos su intención de rescindir el contrato; que en la carta certificada del 2 de diciembre de 2003, VLEI no indicó que el proyecto sería vendido a otro desarrollador, aunque si admiten incumplieron el contrato por fuerza mayor; que VLEI no presentó evidencia fehaciente certificada por un CPA (contador público autorizado) ni estados financieros, certificados ni cuentas de bancos certificando balances de ésta, demostrativos de los alegados problemas económicos desde el 2002; que VLEI admitió no haber radicado quiebra; que no estaba acogida a ningún capítulo bajo la Ley de Quiebra, que la corporación no estaba disuelta y continuaba operando y haciendo negocios a pesar de que el accionista principal estaba ausente; que VLEI mercadeó, vendió y firmó el contrato de compraventa del proyecto a sabiendas del problema económico que enfrentaba; que al momento de presentarse la querella había firmado un contrato de opción entre VLEI y Caribe.

En cuanto a Caribe, determinó que el ingeniero José M. Bonnin admitió que compró el proyecto de 49 residencias y que no había enmendado los planos ni las especificaciones, no había presentado planos nuevos que reflejen cambios al proyecto original en las agencias gubernamentales correspondientes ni en la Administración de Reglamentos y Permisos del Municipio Autónomo de Ponce, pero que lo haría próximamente; que la venta del proyecto por parte de Caribe y de SARI se estaba haciendo a base de los planos, especificaciones y permisología de las distintas agencias gubernamentales según el proyecto original; que el aumento de valor de las residencias de $175,000.00 a $225,000.00 respondió a cambios en losas, inodoros, ventanas, material de gabinetes de cocina, el tamaño de la lavandería ("*laundry*") y del terreno de la residencia (320.00 metros cuadrados).

El D.A.C.O. concluye que el contrato de opción otorgado entre los recurridos y VLEI no fue resuelto conforme lo establece la Ley Núm. 130 de 13 de junio de 1967, según enmendada, conocida como Ley de la Oficina del Oficial de Construcción. 17 L.P.R.A.§ 501 y ss. Que VLEI y LC Real Estate, Inc. incurrieron en prácticas engañosas y violaciones de la Ley Núm. 130, *supra,* al enviar la Hoja de Cancelación. Que las razones dadas por VLEI para rescindir el contrato no constituyeron fuerza mayor o caso fortuito. Que no era de aplicación la doctrina de *Rebus Sic Stantibus* al caso de autos, toda vez no se cumplen los requisitos de previsibilidad, de dificultad extraordinaria y que la alteración de las circunstancias fue posterior a la celebración del contrato. Que no estaba prescrita la causa de acción de los recurridos, toda vez que presentaron la querella dentro de los 15 días, término dispuesto en la cláusula 20 del contrato de compraventa, a partir de la notificación de la consignación.

Asimismo, el D.A.C.O., utilizando la figura del contrato en daño de tercero, concluyó que Caribe y SARI le son responsables solidariamente (junto a VLEI y LC Real Estate, Inc.) a los recurridos y les ordenó a honrarle el contrato otorgado originalmente, honrando el precio pactado de $175,000.00, reservarles la unidad que fue separada u otra similar. Específicamente a VLEI le impuso la suma de $4,000.00 por concepto de todos los daños y perjuicios ocasionados por su incumplimiento de contrato y por el contrato en daño de terceros. Por último refirió copia de esta resolución a la División de Protección al Consumidor del D.A.C.O. para que iniciara una investigación sobre las actuaciones de los recurrentes e imponerles las sanciones que procedan por la violaciones de la Ley Núm. 130 y Ley Núm. 10 de 26 de abril de 1994, según enmendada, conocida como la Ley para Reglamentar el Negocio de Bienes Raíces y la Profesión de Corredor, Vendedor o Empresa de Bienes Raíces de Puerto Rico. 20 L.P.R.A. sec. 3025 y ss.

Oportunamente, VLEI, Caribe y SARI presentaron sus respectivas Mociones de Reconsideración, las cuales se entendieron rechazadas de plano, toda vez que el D.A.C.O. no tomó acción alguna sobre las mismas.

Inconformes, Caribe, VLEI y SARI, acuden ante nos mediante la presentación de tres recursos independientes. Este Tribunal, en virtud de la Regla 38.1 de las de Procedimiento Civil, 32 LPRA Ap. III, R. 38.1, la Regla 38 y la Regla 80.1 de nuestro Reglamento, 2004 JTS 112, ordenó la consolidación de estos recursos.

Primeramente, Caribe sostiene que erró el D.A.C.O. al determinar: (1) que VLEI no rescindió el contrato de opción que existía entre ellos y los recurridos a pesar: (a) la notificación de rescisión fue válida en derecho; (b) de la imposibilidad económica de VLEI de culminar el proyecto justifica la rescisión del contrato; (c) la imposibilidad de VLEI de culminar el proyecto justifica, en la alternativa, la aplicación de la doctrina de *rebus sic stantibus*; (2) al determinar que Caribe tiene que honrar los términos del contrato otorgado entre los recurridos y VLEI; (3) al determinar que Caribe interfirió culposamente con las obligaciones contractuales de un tercero; (4) al determinar que el contrato otorgado entre Caribe y VLEI es un contrato en daño de tercero; (5) al determinar que Caribe es responsable, solidariamente con VLEI, de construir y venderle la unidad reservada por los querellantes al precio pactado con VLEI.

De otro lado, VLEI arguye que incidió el D.A.C.O.: (1) al ordenar el pago de $4,000.00 por concepto de daños por incumplimiento de contrato y daño a terceros ante ausencia total de prueba de daños; (2) al negarse a declarar resuelto el contrato de compraventa otorgados por las partes a pesar de la notificación emitida por VLEI y a pesar de surgir del propio expediente de la agencia que la venta del terreno en donde ubica la unidad opcionada por los recurridos tuvo el único propósito y efecto de evitar la ejecución del proyecto; (3) al determinar que la situación económica de VLEI no es razón en derecho para la cancelación de los contratos.

Por su parte, SARI nos plantea que erró la Agencia: (1) al considerar que había una relación contractual entre los recurridos y SARI (así como los otros recurrentes) y exigir el cumplimiento específico del contrato; (2) al considerar que no se cumplió con lo establecido en el contrato en cuanto a la correcta notificación de la resolución del contrato.

Este Tribunal le ordenó a los recurridos a que presentaran su alegato en oposición. Con el beneficio de su comparecencia atendemos el presente recurso.

## II

### A. Ley Núm. 130 de 13 de junio de 1967

El contrato uniforme de compraventa es reglamentado por el D.A.C.O., a tenor con lo dispuesto por la Ley Número 130, *supra*, y el *"Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico"*, promulgado por el D.A.C.O. al amparo de la misma el 17 de agosto de 1977, Reglamento Núm. 2268, 10 R.P.R. sec. 250.1901 y ss.

Por su parte, la referida Ley Núm. 130, *supra*, que en la actualidad es administrada por el D.A.C.O., ha tenido que ser revisada y enmendada con el surgimiento paulatino de nuevas prácticas en el mercado de construcción de viviendas que afectan al comprador por ser el ente más débil de la ecuación desarrollador-consumidor. Véase Exposición de Motivos de la Ley Núm. 130 de 13 de junio de 1967, según enmendada. 17 L.P.R.A. sec. 501, *et seq*. Bajo el manto del mismo espíritu de protección al consumidor antes aludido, del propio texto de la Exposición de Motivos de dicha Ley se desprende que, con el propósito de que el Gobierno pueda garantizar que el comprador tenga una vivienda habitable *"se hace necesario proteger adecuadamente a los compradores de viviendas, prevenir prácticas indeseables en el negocio de la construcción, regular los contratos de construcción y crear una oficina que se ocupe de promover los objetivos de esta ley"*. (Énfasis nuestro) La referida ley tiene el propósito de reglamentar las actividades de urbanizadores y constructores que se dediquen al negocio de la construcción de viviendas, en todas las etapas inclusive la de venta de las viviendas. *United Fed. Savings v. DACO*, 111 D.P.R. 424 (1981).

Más aún, el propósito singular que motiva la Ley Número 160 de 9 de junio de 1976, que a su vez enmienda la Ley Núm. 130, *supra*, nos refiere que *"[l]a experiencia y flexibilidad-libre de tecnicismos legales del organismo administrativo propicia una más rápida adjudicación de esta clase de querella, por lo que no es necesario recargar a los tribunales de justicia con reclamaciones que puedan resolverse por el organismo*

*administrativo creado para reglamentar determinado campo*". Véase Exposición de Motivos de la Ley Número 160 de 9 de junio de 1976, 17 L.P.R.A. sec. 501, *et seq.* (Énfasis nuestro)

La Ley Núm. 130, *supra*, proscribe, como práctica indeseable en el negocio de la construcción de viviendas, el que un urbanizador o constructor:

*"(a) Publique, haga publicar, o divulgue, en cualquier forma anuncios, declaraciones o informaciones en las que se tergiversen o exageren los términos bajo los cuales se puedan adquirir solares o unidades de vivienda u ofrezca informaciones o cálculos falsos o engañosos en cuanto al precio u otras condiciones para la adquisición de solares o unidades de vivienda.*

*(b) Solicite o acepte depósitos o anticipos en dinero para la reserva de unidades de vivienda en proyectos cuyo desarrollo preliminar o planos preliminares no hayan sido previamente aprobados por la Junta de Planificación, salvo cuando dichos anticipos o depósitos sean con el propósito del tanteo del mercado para conocer la intensidad de la demanda y el mismo sea una cantidad nominal que no .exceda de veinticinco (25) dólares.*

*(c) Altere o modifique los planos de una vivienda o modelo aprobado por la Junta de Planificación y/o la Administración de Reglamentos y Permisos, disponiéndose que toda solicitud que enmiende los planos o especificaciones del proyecto radicada ante la Junta de Planificación y/o la Administración de Reglamentos y Permisos deberá estar precedida de un aviso cursado por el urbanizador o constructor a los optantes y/o compradores, mediante correo certificado con acuse de recibo con por lo menos veinte (20) días de antelación al a radicación de las enmiendas allí solicitadas."* 17 LPRA § 509

Asimismo, el *"Reglamento para Regular las Distintas Actividades que se Llevan a Cabo en el Negocio de la Construcción de Viviendas Privadas en Puerto Rico"*, Reglamento 2268, 10 R.P.R. sec. 250.1903 y ss. (en lo sucesivo Reglamento) promulgado por el D.A.C.O., prescribe en su Sección 10 las prácticas indeseables para el negocio de la construcción. Así también prescribe, cuáles son las cláusulas que debe contener dicho contrato y exige que el contrato a utilizarse sea sometido previamente al D.A.C.O. para su aprobación. A tenor con la reglamentación vigente, el D.A.C.O. había prescrito el contenido de dicho contrato, haciendo formar parte del Reglamento un modelo uniforme para el mismo.

Nuestro Código Civil dispone que cuando un contrato es válido, las obligaciones que nacen del mismo tienen fuerza de ley entre las partes contratantes y deben cumplirse según lo pactado. 31 L.P.R.A. secs. 2994, 3375, 3451. En el caso de autos, las partes suscribieron un Contrato Uniforme de Compraventa, también conocido como una promesa bilateral de compraventa.

En Puerto Rico rige el principio de la libertad de contratación. *Unisys Puerto Rico, Inc. v. Ramallo Brothers.*, 128 D.P.R. 842, 850 (1991). Como parte de esta norma, *"los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público"*. Art. 1207 del Código Civil, 31 L.P.R.A. § 3372.

Una vez establecidas las cláusulas y condiciones del acuerdo, se entenderá perfeccionado el contrato por el consentimiento entre las partes y desde ese momento cada una de ellas vendrá obligada no sólo a cumplir con lo expresamente pactado, sino también con las consecuencias que, según su naturaleza, sean conformes a la buena fe, al uso y a la ley. Art. 1210 del Código Civil, 31 L.P.R.A.·§ 3375. Esa obligación de cumplir con lo pactado se funda en el principio de la buena fe, el cual exige no defraudar la confianza que otro ha puesto en una promesa o conducta. *Unisys v. Ramallo Brothers, ante* (citando a L. Díez-Picazo, *Fundamentos de Derecho Civil Patrimonial*, 2^da ed., Madrid, Ed. Tecnos, 1983, Vol. I, Cap. IV, Pág. 99).

Se presume que el consentimiento prestado por las partes es válido. No obstante, el consentimiento será nulo si fue prestado por error, violencia, intimidación o dolo. Art. 1217 del Código Civil, 31 L.P.R.A. § 3404. El Artículo 1233 del Código Civil de Puerto Rico, dispone lo siguiente:

*"Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.*

*Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aquéllas."* 31 L.P.R.A. §. 3471

No obstante, *"[l]a interpretación de las cláusulas obscuras de un contrato no deberá favorecer a la parte que hubiese ocasionado la obscuridad."* Art. 1240 del Código Civil, 31 L.P.R.A. § 3478.

## B. Concepto de Fuerza Mayor o Caso Fortuito

El concepto de fuerza mayor o caso fortuito —es un suceso eximente de responsabilidad por razón de que no puede preverse o que previsto no puede evitarse—, se define como aquel suceso no imputable al deudor que impide el cumplimiento de la obligación. *Rivera v. Caribbean Home Const. Corp.,* 100 D.P.R. 106 (1971).

Con relación a las obligaciones y a sucesos imprevistos o inevitables, el Art. 1058 de Código Civil, 31 L.P. R.A. § 3022, nos dice que *"nadie responderá de aquellos sucesos que no hubieran podido preverse, o que previstos, fueran inevitables."* Para analizar esta disposición se ha utilizado los conceptos de fuerza mayor y caso fortuito. *O.E.G., D.A.C.O. v. Rivera, Cintrón,* 153 D.P.R. ___, (2001), res. el 12 de enero de 2001, **2001 JTS 6**.

El Tribunal Supremo ha señalado que la culpa consiste en la omisión de la diligencia exigible mediante cuyo empleo podría haberse evitado el resultado dañoso. *"La diligencia exigible es la que cabe esperar del ser humano medio, el buen pater familias. Si el daño es previsible por éste, hay responsabilidad. Si no es previsible, estamos generalmente en presencia de un caso fortuito".* *Arnold Valle Izquierdo v. E.L.A.,* **2002 JTS 70**; *Jiménez v. Pelegrina Espinet,* 112 D.P.R. 700 (1982).

Como sabemos, el caso fortuito es el suceso inesperado o la fuerza mayor que no se puede precaver ni resistir, tales como inundaciones, torrentes, naufragios, incendios, rayos, violencias, ruinas de edificios causadas por alguna desgracia imprevista y otros acontecimientos semejantes. *Públio Díaz v. E.L.A.,* 106 D.P.R. 854 (1978); *O.E.G., D.A.C.O. v. Rivera, Cintrón, ante.*

Cabe señalar, que *"[n]o sólo es caso fortuito un acontecimiento natural, pues también los actos humanos pueden tener la consideración de casos fortuitos respecto del agente o de un tercero cuando ni sobre aquél ni sobre éste pese culpa alguna."* José Castán Tobeñas, *Derecho Civil Español, Común y Foral,* Tomo 1, Vol. 2, 10ma. ed. (1983) pág. 618, *Rivera v. Caribbean Home Const. Corp., Ibid,* a la pág. 114. El comentarista Manuel Albaladejo García, en su obra *Comentarios al Código Civil y Compilaciones Forales,* Tomo XV, Vol. 1, Ed. Revista de Derecho Privado, Madrid (1989), a las págs. 646-649, nos señala algunos ejemplos de casos fortuitos o de fuerza mayor causados por actos humanos, a saber: el hecho de un tercero puede dañar el objeto de la prestación, una modificación legislativa (modificación o aprobación de un plan urbanístico, que supone inviabilidad de un proyecto de obras), la huelga y la guerra, entre otros. Sin embargo, específicamente señala que no se considera caso fortuito o fuerza mayor *"... la falta de medios económicos del deudor, aunque estimo que esta afirmación sólo será totalmente válida en el deudor de una cantidad de dinero (su obligación absoluta)".* *Id.*

A pesar de ser este evento uno que produce la liberación del deudor, éste no siempre queda eximido de

responsabilidad por un fenómeno natural a título de caso fortuito o fuerza mayor. *Rivera v. Caribbean Home Const. Corp.*, 100 D.P.R. 106 (1971). Para que cobre aplicación la doctrina de caso fortuito, produciendo entonces la liberación del deudor de una obligación, deben concurrir las siguientes condiciones: (1) que haya un hecho imprevisible o aun previsto, sea inevitable; (2) imposibilidad absoluta o relativa de cumplimiento de la prestación; (3) inimputabilidad al deudor respecto al acaecimiento fortuito y sus consecuencias; y (4) realización de los actos necesarios tendentes a evitar la agravación de los efectos del evento fortuito. Francisco Soto Nieto, *El Caso Fortuito y La Fuerza Mayor - Los Riesgos de la Contratación,* Ediciones Norte, S.A., Barcelona, España (1965).

De lo anterior, surge con meridiana claridad que para la determinación de si un fenómeno natural constituye un caso fortuito o fuerza mayor es necesario que el deudor alegue y pruebe que se tomaron las medidas propias para evitar el daño actuando con la diligencia de un buen padre de familia. *P. R. & American Inc. Co. v. Durán Manzanal, supra; Rivera v. Caribbean Home Const. Corp., supra.* Descargado tal peso de prueba, queda rebatida la presunción de pérdida por culpa del deudor que establece el Artículo 1137 del Código Civil y entonces, de perderse o afectarse la cosa como consecuencia del caso fortuito, quedaría liberado de responsabilidad el deudor.

## C. Doctrina de *rebus sic stantibus*

La doctrina *rebus sic stantibus*, es la fórmula de mayor aceptación entre las variadas teorías sobre la revisión de contratos por alteración de las circunstancias. La misma representa un contrapeso a la rigidez y al absolutismo expuesto en la prédica de sostener en todo momento y circunstancia, la voluntad contractual de las partes simbolizada en la máxima *pacta sunt servanda.* Su aplicación se justifica sobre todo en momentos de crisis económica o cuando se trata de contratos de ejecución sucesiva y larga dimensión, donde el cambio de circunstancias, ajeno a la actuación y voluntad de las partes, puede hacer excesivamente onerosa para una de las partes la ejecución de lo convenido o puede convertir el contrato en objetivamente injusto. *Casera Foods, Inc. v. E.L.A.,* 108 D.P.R. 850, 854-855 (1979), citando a Castán, *Derecho Civil Español, Común y Floral,* Tomo 3, pág. 544 (1974).

La doctrina de *rebus sic stantibus* permite que a manera de excepción y en circunstancias extraordinarias, el tribunal en su deber de procurar que se logre un resultado equitativo y justo, interfiera con la voluntad de las partes y modifique el negocio amoldándolo a las nuevas circunstancias. Sin embargo, la jurisprudencia es clara al señalar que el tribunal, al ejercer su función moderadora, debe tomar en cuenta que al ser un remedio en extremo excepcional, la aplicación de la doctrina *rebus sic stantibus,* potencialmente puede desequilibrar la seguridad en el tráfico comercial. *Casera Foods, Inc. v. E.L.A, supra,* págs. 855 y 857.

Los requisitos admitidos para la aplicación de la doctrina *rebus sic stantibus* como remedio de excepción son: (1) el carácter normalmente imprevisible del acontecimiento que haya surgido; (2) que la ejecución del contrato resulte extremadamente difícil u onerosa, de modo que constituya para el deudor una lesión que no guarde proporción con la ventaja prevista para él en el contrato; (3) que el contrato no tenga un carácter aleatorio o de pura especulación, con el que las partes quisieron prever en cierto modo, la posibilidad del acontecimiento; (4) que no exista acción dolosa en ninguna de las partes, ya que los efectos de los supuestos delitos y cuasi delitos están especialmente predeterminados por ley; (5) que el contrato sea de tracto sucesivo o esté referido a un momento futuro, de modo que tenga cierta duración; (6) que la alteración de las circunstancias sea posterior a la celebración del contrato y que presente carácter de cierta permanencia; y (7) que exista petición de parte interesada. (Citas omitidas.) *Casera Foods, Inc. v. E.L.A., supra,* págs. 855-858.

El Tribunal Supremo ha expresado que para que proceda la aplicación de dicha doctrina es indispensable que concurran los siete (7) requisitos antes enumerados. El incumplimiento con uno de ellos, impide la revisión de un contrato mediante la aplicación de la norma jurídica del *rebus sic stantibus,* por tratarse de un remedio de

excepción que requiere de prudencia y moderación al imponerse. *Mun. de Ponce v. A.C. et al.*, 153 D.P.R. ___ (2001), opinión de 29 de diciembre de 2000; **2001 J.T.S. 3**, págs. 662-663; *Casera Foods, Inc. v. E.L.A., supra*, pág. 857.

## D. La Figura de Contrato en Daño de Tercero

En *Gen. Office Prods. v A.M. Capen's Sons*, 115 D.P.R. 553 (1984), señalamos que la figura del contrato en daño de tercero se reconoce en España y que es afín y análoga a la figura de interferencia torticera con una relación contractual.

Es principio estatutario que los contratos sólo producen efecto entre las partes que los otorgan y sus herederos. Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374. La regla general es que en relación con un tercero un contrato es irrelevante, ya que éste simplemente regula las relaciones entre las partes contratantes y al tercero ni siquiera le afecta. L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. I, pág. 281. *"Dentro del cuadro de excepciones al principio general de la eficacia relativa del contrato y como uno de los supuestos en que un contrato puede producir efectos en relación con los terceros, pueden situarse los llamados 'contratos en daño de tercero'."* (Citas Omitidas.) *Dennis, Metro Invs. v. City Fed. Savs.*, 121 DPR 197 (1988).

Los comentaristas Díez-Picazo y Gullón definen la figura de contrato en daño de tercero como aquélla en que: *"...al celebrar un contrato, y precisamente a causa de su celebración, los contratantes ocasionan un daño a una tercera persona, y ello tanto si son conscientes del mismo como si es uno de ellos el que exclusivamente desea o es consciente de la producción del daño."* Díez-Picazo y Gullón, *op. cit.*, pág. 133. Véanse, también: Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial, op. cit.*; Puig Brutau, *op. cit.*; Gullón Ballesteros, *op. cit.*, pág. 115 (9); *Dennis, Metro Invs. v. City Fed. Savs., supra.*

Es necesario, para que exista un contrato en daño de tercero, que se cumplan los requisitos siguientes: (1) que haya un tercero afectado; (2) que se haya causado un daño a esa tercera persona; (3) que medie un nexo causal entre el daño y el contrato, y (4) que medie la intención de causar daño, ya sea de ambos contratantes o de uno solo de ellos. *Dennis, Metro Invs. v. City Fed. Savs., supra.*

## A. El tercero afectado

Para ser tercero afectado se requiere no solamente que se haya permanecido extraño a la relación contractual formada, sino que también es necesario que el tercero se encuentre *"vinculado a las partes o a una de ellas por una relación jurídica que es dañada mediante aquélla, o bien se encuentra en una situación de dependencia con el contrato dañoso de causa a efecto"*. Gullón Ballesteros, *op. cit.*, pág. 122. Lo fundamental es la incompatibilidad entre la posición jurídica de los terceros afectados y la que deriva del contrato celebrado. *Dennis, Metro Invs. v. City Fed. Savs., supra.*

## B. El daño

Para que exista un contrato en daño de tercero tiene también que haber un daño causado por dicho contrato al tercero afectado. Sobre este particular nos dice Díez-Picazo que *"[u]n 'daño' es una lesión o violación de un concreto derecho subjetivo. No hay por ello daño de terceros si simplemente son colocados en situación desfavorable intereses que no son especialmente protegidos"*. L. Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial*, Madrid, Ed. Tecnos, 1979, Vol. 1, pág. 281. Refiéranse también, a L. Díez-Picazo y A. Gullón, *Sistema de Derecho Civil*, 3ra ed. rev., Madrid, Ed. Tecnos, 1982, págs. 133-134. Gullón Ballesteros, a su vez, indica que el daño *"es la disminución o sustracción de un bien jurídico... lesión de un interés legalmente tutelado."* Gullón Ballesteros, *op. cit.*, pág. 127. Díez-Picazo y Gullón, *op. cit.*, pág. 133, expresan que:

*"La problemática de estos contratos nace especialmente cuando se violan derechos subjetivos de créditos de terceros, que sufren las consecuencias perjudiciales de los mismos. Admitido ya sin discusión por la doctrina y jurisprudencia el deber de respetar las situaciones jurídicas ajenas (obligacionales o reales), es evidente la posibilidad de que un contrato lesione las mismas cuando uno de los contratantes es sujeto de aquel derecho de crédito (el exclusivista, que es perjudicado porque el que le concedió la exclusiva de venta está vendiendo a otros en la zona reservada...).*" Dennis, Metro Invs. v. City Fed. Savs., supra.

## C. Nexo causal entre el daño y el contrato

La producción del daño tiene que ser una consecuencia directa e inmediata del contrato. *"El contrato propiamente en daño de tercero . . . [va] dirigido directamente a la producción del efecto perjudicial."* Puig Brutau, *op. cit.*, pág. 264; Dennis, Metro Invs. v. City Fed. Savs., supra.

## D. Intención de causar daño

Como último requisito, encontramos que debe mediar intención de causar daño, ya sea de parte de *"ambos contratantes, o de sólo uno de ellos"*. Puig Brutau, *op. cit.* Dennis, Metro Invs. v. City Fed. Savs., supra. Sobre el particular, el Tribunal Supremo resolvió *"que basta a tal efecto con que el perjudicado pruebe o presente hechos que permitan inferir que... actuó intencionalmente, con conocimiento de la existencia del contrato"* o la relación jurídica del tercero. Gen. Office Prods. v A.M. Capen's Sons, supra, a la pág. 559.

### III
Examinemos los hechos del caso de autos bajo el crisol del derecho antes esbozado.

### A. Notificación de la resolución del contrato

El contrato suscrito entre VLEI y los recurridos dispone (en lo pertinente) en sus incisos 20 y 22 como sigue:

*"20. En caso de que el comprador o la vendedora decida resolver este contrato... deberá notificar por correo certificado con acuse de recibo a la vendedora o al comprador según sea el caso ...*

*Ahora bien, si la parte que fuera notificada no estuviera de acuerdo con la resolución del contrato, deberá notificar este hecho a la otra parte dentro de 15 días de haber sido notificada de la resolución del contrato.*

*...*

*22. Toda notificación que no se haya previsto en algunas de las cláusulas de este contrato de la Vendedora al Comprador o del Comprador a la Vendedora, se harán con no menos de quince (15) días de anticipación por correo certificado...".*

Véase recurso, a las págs. 76-79.

Arguye Caribe, que a pesar de haber sido notificados los recurridos en dos ocasiones, la primera el 23 de julio de 2003, mediante la carta de LC Real Estate, Inc., y la segunda mediante la carta certificada de 2 de diciembre de 2003, de la resolución del contrato de compraventa, éstos nunca notificaron que no estuvieran de acuerdo con la resolución del contrato. Sostiene que estas dos notificaciones tuvieron el efecto innegable de rescindir el contrato. Señala que no le asiste la razón al D.A.C.O. al determinar que la notificación verbal hecha por los recurridos a LC Real Estate, Inc. fue válida y suficiente en derecho para objetar la rescisión del contrato. D.A.C.O. resolvió que los recurridos no tenían copia del contrato y desconocían los términos allí comprendidos.

Caribe argumenta que ésto resulta insólito, puesto que uno de los recurridos es abogado y, como tal, solicitaría copia del contrato de compraventa y venía obligada a conocer la ley.

Sobre este particular, VLEI argumenta que tanto la Ley Núm. 130, *ante*, como el Reglamento, disponen que la notificación de cancelación de contratos será por escrito a la otra parte mediante correo certificado con acuse de recibo. Sostiene que VLEI envió una carta certificada el 2 de diciembre de 2003, a la dirección que obraba en sus récords, según disponía el contrato aquí en controversia. Que dicha correspondencia fue devuelta por no haber sido reclamada por los recurridos, actuación imputable únicamente a éstos. Argumenta, que no puede ser penalizado, toda vez que actúo con el grado de diligencia requerido por el contrato.

Similar argumento esboza SARI, al sostener que los recurridos declararon en la vista administrativa que su dirección era la misma, que ellos mismos reconocieron no haberla recogido, a diferencia de que no la hayan recibido, que ello refleja mala intención de los recurridos, y en donde las Reglas de Evidencias vigentes expresan que se da por recibida la misma.

De entrada, se hace necesario analizar a la transcripción de la vista administrativa para aclarar la prueba desfilada y creída por el D.A.C.O. Veamos.

En la transcripción de la vista en su fondo, a preguntas del licenciado Alvin Rivera Renta, sobre la entrega de copia del contrato, la recurrida, Mirla M. Rodríguez Marín, respondió:

*"R. No me lo entregaron porque ella dijo que ese contrato...*

*P. ¿Quién es ella?*

*R. Iris García.*

*P. Iris García. [representante de LC Real Estate, Inc.]*

*R. Me dijo que se tenía que llevar el contrato original para tomarle la firma al representante de Ven-Lour.*

*P. Okay. Antes de recibir su copia de contrato, ¿qué ocurre, si algo?*

*R. Antes de yo recibir la copia del contrato, eh, yo recibí una carta por parte de LC Real Estate en la que ellos, eh, me indican que debido a que el desarrollador, eh, ha confrontado ciertos problemas, no va, no van a poder continuar con el proyecto. ... Véase Transcripción, a la pág. 18, líneas 10 a la 22.*

*...*

*P. ¿Qué ocurrió después que usted firma este contrato y después que recibe la carta de LC Real Estate a la, a la que se mencionó anteriormente, si algo?*

*R. Bueno, la propia carta que me envía, este, L, LC Real Estate me indica que si yo tengo alguna duda, que no estoy de acuerdo, pues, me comunique con la señora Iris García, que es la, la vendedora. Pues, a, en seguimiento a esa carta, eh, yo procedí a comunicarme con Iris García, eh, para dejarle saber que no estaba de acuerdo y hacerle el señalamiento de que la carta, eh, no decía la ... (?) Que había una incongruencia, una incongruencia, perdón, eh, entre la misma que se me escribió y, y la carta. Y que en ese momento le manifesté que yo tenía interés, no que se me devolviera el dinero ni de recibir el contrato, sino de continuar...mi propiedad y que se me pasara mi expediente y depósito al nuevo desarrollador para que me mandaran el contrato que yo había firmado de compra-venta. Véase Transcripción, a las págs. 34-35, líneas 8 a la 23, y 1.*

En cuanto a su dirección postal, la recurrida respondió a preguntas de la licenciada Magda Lee Rodríguez lo siguiente:

R. Urbanización Estancias del Golf Club calle Wito Morales Número 505, Ponce, Puerto Rico 00730.

P. Y le pregunto, desde la fecha que usted recibió ese contrato...(?) hasta la fecha de hoy si esa continúa siendo su dirección postal.

R. Eso es correcto. Sólo cambió el zip code. La dirección postal, pero hay un cambio del zip code... (?)

P. ¿Cuál es ahora?

R. 00730 ahora. Antes 00731, pero el correo lo cambió.

Véase Transcripción, a la pág. 66, lineas14 a la 23.

A preguntas de la misma letrada, sobre el recibo de la carta certificada, la recurrida respondió:

R. Esta carta yo nunca la recibí. La primera vez que la estoy viendo es aquí.

P. ¿Nunca la leyó?

R. Bueno, la, la, la, la vi cuando hicieron la, la, hicieron la compra-venta de la residencia, pero esta carta yo nunca la recibí.

P. ¿No la reclamó?

R. No.

P. ¿Nunca la reclamó?

R. Es que nunca la recibí. Nunca la recibí.

P. Yo voy a pedir que me...

R. Nunca... Pero nunca recibí la carta.

P. Indique abajo, eh, si en la copia que tiene abajo en la carta es un sello del correo donde se depositó en el correo. ¿Qué fecha se depositó?

R. Es que...

P. Según el sello que tiene abajo.

R. No sé...

P. En el sello de abajo.

R. Es que no se nota nada.

*P. Mire a ver si...*

*R. Está oscuro...*

*P. ...no es diciembre 3 del 2003.*

*R. Diciembre 3 del 2003. Es que está...*

*P. Bien. Pues, esa fue la fecha que el correo certifica que se depositó. ¿Correcto?*

*R. Bueno, pues, eso es el correo. No le podría certificar, pero lo que sé es diciembre 3 del, del, correo Caparra Heights.*

*P. Está bien. ... (?).*

*R. Supongo que sí.*

*P. ...en efecto sí se le canceló el contrato de compra-venta y se le notificó... (?) a su dirección.*

*R. No. ...porque eso yo nunca lo recibí."*

Véase Transcripción, a las págs. 69-70, líneas 6 a la 23; y 1 a la 15.

Abona a lo anterior, que no fue hasta el 11 de junio de 2004, que los recurridos recibieron una copia del contrato de compraventa, vía fax, ilegible y sin firmar por parte de VLEI. Véase recurso, a la pág. 19; y transcripción a las págs. 36-41. Teniendo presente, que para las fechas en que las cartas fueron enviadas (la carta de LC Real Estate, Inc., de 23 de julio de 2003 y la carta certificada de 2 de diciembre de 2003 fue enviada el 3 de diciembre de 2003), los recurridos estuvieron en todo momento desprovistos de una copia del contrato aquí en controversia, para poder conocer o que se les pudiera imputar el conocimiento del proceso para oponerse a la resolución del contrato; forzoso resulta concluir no podía exigírseles que cumplieran con lo dispuesto en las cláusulas 20 y 22 antes reseñadas.

A igual conclusión llegamos en cuanto a el planteamiento que nos hace Caribe, en cuanto a que *"[l]a ignorancia de las leyes no excusa de su cumplimiento"*. Art. 2 del Código Civil de Puerto Rico, 31 LPRA § 2. Argumenta que, como la recurrida Mirla M. Rodríguez Marín es abogada de profesión, viene obligada a conocer la sección 17 del Reglamento cuanto a: *"... De no estar de acuerdo con la resolución del contrato propuesta, deberá notificarlo según se provee anterior [correo certificado] a la otra parte dentro de los quince días siguientes de haber la notificación de la decisión,..."*. Reglamento Núm. 2268, *supra*, Sección 17. Concluye que sería muy difícil que se pueda excusar del cumplimiento que le impone dicha ley (el Reglamento).

Recuerde Caribe que las obligaciones que nacen de un contrato válido tienen fuerza de ley entre las partes contratantes y deben cumplirse según lo pactado. Art. 1044 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 2994. Es decir, es el contrato mismo la ley que venía obligada a conocer la recurrida. La obligaciones de VLEI para con los recurridos, y viceversa, emanan del contrato uniforme de compraventa; esa es la ley entre las partes. De esta ley sí se pudiera exigir conocimiento a los recurridos de haberse entregado copia del mismo. De igual forma, pudiéramos exigirle a los recurridos que conocieran el Reglamento y la Ley Núm. 130, si VLEI o LC Real Estate, Inc. le hubiese entregado copia del contrato en controversia, toda vez que en el mismo es que se hace referencia a dichos cuerpos legales. Véase recurso, a la pág. 59. Bástenos añadir lo resuelto por el Tribunal Supremo en *Pueblo v. Miranda Colón*, 115 D.P.R. 511, 512 (1984):

*"Es principio universalmente reconocido que la ignorancia de las leyes no excusa de su incumplimiento. Lo hallamos recogido en esos precisos términos en el Art. 2 del Código Civil, 31 L.P.R.A. sec. 2. Esto no quiere decir que el abogado tiene que conocer todas las leyes. Ello sería humanamente imposible. Pero su incumplimiento de las leyes no puede escudarse y mucho menos justificarse en su ignorancia de ellas."*

Sin embargo, los recurridos no levantaron como defensa el desconocimiento de la ley o del reglamento. Ellos testificaron que no se le entregó copia del contrato. Ante lo declarado por los recurridos, D.A.C.O., ante la carencia del contrato --donde además obraba la dirección postal de VLEI-- aquilató la prueba y determinó que el contrato no fue resuelto conforme lo establece la Ley Núm. 130, *ante,* y el Reglamento. Véase recurso, a la pág. 22. Entendió el foro administrativo que fue rebatida la presunción de que la carta fue recibida por los recurridos. Asimismo, entendió que las gestiones realizadas por los recurridos tuvieron el efecto de oponerse a la resolución del contrato. Forzoso nos resulta confirmar estas determinaciones del D.A.C.O.

Como cuestión de hecho, el señor Alfredo Cintrón, presidente de VLEI, testificó que no sabía, que desconocía, si se había vuelto a enviar la carta certificada, aunque sí recordaba que la misma no fue reclamada y fue devuelta. Véase transcripción a la pág. 151, líneas 2 a la 19. Esto contrasta con lo expuesto por dicha parte en la petición de consignación. En dicha moción se señaló que VLEI había realizados varias gestiones tratando de comunicarse con los recurridos, resultando todas infructuosas. Véase recurso a la pág. 108.

Por lo tanto, no le mereció credibilidad al D.A.C.O. lo declarado por el señor Alfredo Cintrón, determinando que no hizo gestión alguna, desde el 2 de diciembre de 2003 hasta el 21 de julio de 2004, para notificarles a los recurridos su intención de resolver el contrato. Véase recurso, a la pág. 20. **Cabe resaltar, que los recurridos son vecinos del mismo proyecto aquí en controversia y era factible el que, conociendo su dirección, fueran notificados fácilmente.**

Sin embargo, los recurridos testificaron que se comunicaron y visitaron a la representante de LC Real Estate, Inc. para oponerse a la resolución del contrato en repetidas ocasiones. Véase Transcripción, a las págs. 34-35, 60 y 93, líneas 8 a la 23, línea 1; líneas 8 a la 14; y líneas 16 a la 21. Más aún, con el propósito de poder oponerse a dicha resolución, hicieron innumerables gestiones para conseguir el contrato con LC Real Estate, Inc., y con VLEI. Ello fue objeto de juicio por parte del D.A.C.O., quien lo apreció y le mereció entero crédito. Véase recurso a la pág. 19.

Si ello no fuera bastante, luego de recibir copia de la petición de consignación antes reseñada, los recurridos expeditos acudieron al D.A.C.O., presentando la querella que hoy nos ocupa, inequívoca señal de que nunca estuvieron de acuerdo con la resolución del contrato pretendida por VLEI. Los recurrentes hoy pretenden que avalemos su propuesta de que la carta de LC Real Estate, Inc. tuvo el efecto de notificar la resolución del contrato de opción, a pesar de que dicha carta no fue enviada por correo certificado, según dispone el contrato en cuestión. Sin embargo, se oponen a que se le de igual reconocimiento a las conversaciones telefónicas y verbales o personales sostenidas por los recurridos con LC Real Estate y SARI mediante las cuales se opusieron a la resolución del contrato. Véase recurso, a la pág. 19 y transcripción a las págs. 50-51, a las líneas 18-23 y 1-9. Acceder a semejante propuesta nos parece contrario a los más básicos principios de buena fe consagrados en nuestro ordenamiento jurídico. Concurrimos con la determinación del D.A.C.O. de que la notificación de resolución del contrato no fue válida en derecho.

**B. Resolución del Contrato por Fuerza Mayor o Caso Fortuito**

El contrato suscrito entre VLEI y los recurridos dispone (en lo pertinente) en su inciso 18 como sigue:

*"18. Mediante la debida notificación al comprador, la vendedora podrá resolver este contrato en cualquiera de los siguientes casos:*

*a)...*

*b)...*

*c)...*

*d) Si por fuerza mayor o caso fortuito no fuese posible cumplir con los términos del contrato"*

Véase recurso, a la pág. 74.

Caribe plantea que en el caso de autos no era previsible que el presidente de VLEI, el señor Ventura Asilis, fuera arrestado y encontrado culpable por soborno. Sostienen que eso afecto las finanzas de VLEI e hizo imposible completar el proyecto de viviendas aquí en controversia. Alegan que las deudas a suplidores, bancos y al municipio, unido a la falta de financiamiento y a la ausencia de su presidente, justificaba la aplicación del inciso (d) de la cláusula 18 del contrato para resolver el mismo por fuerza mayor o caso fortuito.

Por su parte, VLEI sostiene que, contrario a lo resuelto por el D.A.C.O., su insolvencia sobrevino posterior al otorgamiento del contrato de opción. Argumenta que, cuando la situación económica se convierte en impedimento para cumplir una obligación, por ser la misma imprevisible o fuera del control de la voluntad del deudor, dicha situación se convierte en una fuerza mayor que impide y hace imposible el cumplimiento. Alega que de la evidencia presentada y admitida surgen las obligaciones impagadas de VLEI.

Como en el caso de autos, el contrato en controversia nada dispone sobre que situaciones o cosas pueden considerarse fuerza mayor o caso fortuito, utilicemos a los comentaristas y la jurisprudencia antes reseñada para tener eventos ejemplares de lo que entiende el Tribunal Supremo es fuerza mayor o caso fortuito. Estamos ante actos humanos, que no pueden tener la consideración de casos fortuitos respecto del agente o de un tercero, por cuanto sobre aquél y sobre éste pesa culpa. José Castán Tobeñas, *Ibid.,* pág. 618. *Rivera v. Caribbean Home Const. Corp., supra.* La falta del presidente de una corporación a causa de ser procesado criminalmente y hallado culpable, sumado a la falta de medios económicos del deudor (VLEI) no pueden ser considerados como caso fortuito o fuerza mayor. Manuel Albaladejo García, *Ibid.* a las págs. 646-649. Concluimos que resolvió correctamente el D.A.C.O. al determinar que las razones esbozadas por VLEI no se consideran como caso fortuito o fuerza mayor que permitieran la resolución del contrato conforme a derecho.

Ciertamente, entendemos que el procesamiento criminal del señor Ventura Asilis no cualifica como uno fuerza mayor o caso fortuito. La precaria situación económica de VLEI era previsible y evitable con la realización de los actos necesarios tendentes a evitar la agravación de los efectos de dicho evento. En última instancia, accediendo a lo solicitado por los recurrentes, atribuyéndole la precaria situación económica a la ausencia del presidente de VLEI, sería un hecho imputable al deudor respecto al acaecimiento fortuito y sus consecuencias. *Rivera v. Caribbean Home Const. Corp., supra.*

## C. Aplicación de la Doctrina de *Rebus Sic Stantibus*

Sobre esta doctrina, Caribe plantea que la situación del presidente de VLEI fue imprevista e imposibilitó la obtención de financiamiento para cumplir con su obligación contractual de entregarle las residencias a los recurridos. Sostiene que esto justifica la aplicación de la doctrina *rebus sic stantibus* para resolver el contrato que nos ocupa.

De otro lado, VLEI sostiene que al contrato que nos ocupa le aplica la doctrina de imposibilidad sobrevenida que comprende la doctrina *rebus sic stantibus*. Señala que no es un requisito para su aplicación que el deudor esté acogido a un procedimiento de quiebras. Concluye que en virtud de la aplicación al caso de esta

doctrina, el remedio que tienen los recurridos es la resolución del contrato con la correspondiente devolución de su prestación.

El señor Luis Cintrón, presidente para ese entonces de VLEI, testificó que los problemas comenzaron en el año 2002, fecha en que estaban vendiendo las opciones del proyecto en controversia. Las deudas examinadas en el expediente eran las que normalmente se incurren en el negocio de la construcción. Asimismo, el contrato de préstamo de VLEI y el Banco Santander para financiar el proyecto de 49 unidades, fue enmendado en dos ocasiones previo a otorgarse el contrato con los recurridos. Este hecho indica que era previsible.

La falta del presidente no era óbice para no conseguir financiamiento, pues tenían otras propiedades que utilizaron para garantizar otra deuda con Caribe y que fue motivo del segundo acuerdo del 16 de marzo de 2005. Nada de la evidencia documental que obra en autos nos mueve a aplicar la doctrina *rebus sic stantibus* al caso de marras. Resuelto que las razones esbozadas por los recurrentes no son de naturaleza imprevisible, que coetáneo con la alegada precaria situación económica, a sabiendas, VLEI otorgó de contratos de compraventa provocando una acción dolosa contra los recurridos, hace imposible la aplicación de la doctrina reseñada, toda vez que no se cumplen todos los requisitos antes enumerados. *Casera Foods, Inc. v. E.L.A., ante.*

Cabe añadir, como muy bien señala VLEI, que no es un requisito de la doctrina de *rebus sic stantibus* que la parte que alega razones para la cancelación de un contrato, tenga que acogerse a un procedimiento de quiebra. Sin embargo, tratándose de un desarrollo millonario, donde se alegaba una situación económica precaria por parte de VLEI, que le sobrevino de manera imprevista, lo más probable era que un buen padre de familia, en orden de proteger su crédito, su propiedad y su inversión, hubiese tomado medidas tan drásticas como radicar una quiebra. Dicha evidencia, unida a estados financieros auditados de VLEI, hubieran sido altamente persuasivos para el D.A.C.O. La ausencia de la misma, militó en contra de veracidad de lo declarado por VLEI en la vista y a la agencia administrativa no le mereció credibilidad, Concurrimos con el D.A.C.O.

Reiteramos, la norma de que el incumplimiento con uno de los requisitos, impide la revisión de un contrato mediante la aplicación de la norma jurídica del *rebus sic stantibus*, por tratarse de un remedio de excepción que requiere de prudencia y moderación al imponerse. *Mun. de Ponce v. A.C. et al., ante.* Tampoco se cometió este error.

## D. Aplicación de la Figura de Contrato de Tercero

En el caso de autos, el D.A.C.O. aplicó esta figura, pues entendió que se configuraron todos los requisitos que el Tribunal Supremo impuso mediante su jurisprudencia. Veamos.

### 1. El tercero afectado

Los recurridos son el tercero afectado con relación a los contratos suscritos entre VLEI y Caribe; y entre Caribe y SARI, pues permaneció extraño a la relación contractual formada entre ellos. También, como tercero se encontraba vinculado jurídicamente a una de las partes, VLEI, relación jurídica ésta que fue afectada mediante la otorgación del Acuerdo de Opción de Compraventa entre VLEI y Caribe el 6 de abril de 2004; Acuerdo de 28 de enero de 2005; Acuerdo de 16 de marzo de 2005 y la Escritura Número Seis de Compraventa otorgada el 16 de marzo de 2005. Véase recurso a la pág. 161. Para esta fecha todavía no se había resuelto el contrato entre los recurridos y VLEI. Recordemos, que no habiéndose recibido las carta certificada antes reseñada e informado a VLEI a través de su representante, LC Real Estate, Inc., la oposición de los recurridos a la resolución del contrato de opción, seguía vigente el mismo. Nótese, que posteriormente, el 16 de junio de 2004, VLEI presentó su solicitud de consignación al tribunal. Gullón Ballesteros, *op. cit.*, pág. 122. *Dennis, Metro Invs. v. City Fed. Savs., supra.* Concurrimos con la determinación del D.A.C.O. a estos efectos.

## 2. El daño

Dichos contratos (Contrato de opción de compraventa, los dos Acuerdos y finalmente la escritura pública entre VLEI y Caribe) es en daño de tercero, puesto que causó daño al tercero afectado: los recurridos. El daño fue la lesión de un interés legalmente tutelado, el derecho exclusivo a comprar el solar opcionado. Ciertamente, estos contratos violan los derechos subjetivos de créditos de los terceros (los recurridos), que sufrieron las consecuencias perjudiciales de los mismos. Era el deber de VLEI y Caribe, y SARI, respetar las situaciones jurídicas ajenas (obligacionales o reales), toda vez era evidente la posibilidad de que estos contratos lesionaban las mismas cuando los recurridos eran el sujeto de aquel derecho de crédito; el exclusivista, que es perjudicado porque el que le concedió la exclusiva de venta, está vendiendo a otros en la zona reservada. *Dennis, Metro Invs. v. City Fed. Savs.*, *supra*. En el caso de autos, la reserva exclusiva del derecho a comprar de los recurridos quedó transgredido como resultado de los contratos antes reseñados. *Id.* Concurrimos.

## 3. Nexo causal entre el daño y el contrato

Son los contratos ante reseñados los que sacan del patrimonio de VLEI el bien opcionado, causando la pérdida o daño a los recurridos, es decir, el contrato propiamente en daño de tercero fue dirigido directamente a la producción del efecto perjudicial. Puig Brutau, *op. cit.*, pág. 264; *Dennis, Metro Invs. v. City Fed. Savs.*, *supra*. Coincidimos con el D.A.C.O.

## 4. Intención de causar daño

Como último requisito, encontramos que medió intención de causar daño, de ambos contratantes. En el caso de autos, los recurridos (perjudicados) presentaron hechos que permitieron al D.A.C.O. inferir que actuaron intencionalmente; con conocimiento de la existencia del contrato o la relación jurídica del tercero. *Gen. Office Prods. v. A.M. Capen's Sons*, *supra*, a la pág. 559; *Dennis, Metro Invs. v. City Fed. Savs.*, *supra*, a la pág. 219.

Primeramente, los recurridos se opusieron a través de LC Real Estate, Inc., quien era representante del vendedor VLEI. De igual manera, los recurridos se lo informaron a SARI, nuevo representante de Caribe, la existencia del contrato y la intención de hacerlo valer. SARI tenía la obligación de notificárselo a Caribe, puesto que era su corredor de bienes raíces o *realtor*. VLEI le indicó a Caribe al momento de otorgar el contrato de opción entre ellos, la existencia de un contrato con un corredor de bienes raíces, el cual no asumió. Ello evidencia que Caribe y VLEI tuvieron oportunidad de discutir la posibilidad o la existencia de contratos de opciones otorgados por LC Real Estate. Véase transcripción, a las págs. 174-175. Asimismo, se señala en dicho documento que Caribe procedió a firmar contrato de corretaje con el señor Abraham García, presidente de SARI. Véase recurso, a la pág. 170. En la vista administrativa, el señor Ángel Cintrón Cintrón (presidente de VLEI) testificó que originalmente el corredor de bienes raíces (realtor) fue el señor Abraham García y que después, éste contrató a LC Real Estate. Véase transcripción a la pág. 183. Este hecho lo negó el señor Abraham García al testificar. Véase transcripción, a la pág. 178. Como podemos colegir de lo anterior, todos los recurrentes tenían o debían tener conocimiento de la existencia del contrato otorgado entre los recurridos y VLEI. A igual determinación llegó D.A.C.O. y nosotros la avalamos.

## 5. Consecuencias

Bajo la figura de contrato en daño de tercero, consideraremos las consecuencias que repercuten en la esfera jurídica ajena y la responsabilidad del que contrata con el que es sujeto pasivo del derecho subjetivo lesionado, VLEI. Gullón Ballesteros, *op. cit.*, pág. 11. *Dennis, Metro Invs. v. City Fed. Savs.*, *supra*. Esta responsabilidad *"debe establecerse en función de que conociese o no que se producía la lesión, respondiendo en el primer supuesto a base del [Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141]...".* Díez-Picazo y Gullón, *op. cit.* *Dennis, Metro Invs. v. City Fed. Savs.*, *supra*. *"El contrato regula simplemente las relaciones entre las partes*

*contratantes. Al tercero, en cuanto tal contrato, ni siquiera le afecta. Podrá, únicamente, coexistir con el contrato un acto ilícito que es la causa del daño. Pero este ilícito estará sometido a la disciplina general de la responsabilidad aquiliana. (Énfasis suplido.)* Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial,* op. cit., pág. 281. Dennis, *Metro Invs. v. City Fed. Savs., supra.*

*El contrato en daño de tercero involucra dos supuestos bajo los cuales los contratantes ocasionan el daño a una tercera persona y, dependiendo del supuesto, se producen consecuencias jurídicas diferentes. En primer lugar, pensar que en todos aquellos casos en que ambos contratantes conciertan para ocasionar un daño al tercero, el contrato tiene causa ilícita y que, por consiguiente, esta circunstancia acarrea la nulidad del mismo. La nulidad puede ser solicitada por el tercero perjudicado, quien de esta manera puede poner fin a la lesión que mediante el contrato se le produce."* Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial,* op. cit. Refiéranse, también, a Puig Brutau, *op. cit.,* pág. 109.

El caso de autos puede ser enmarcado dentro de este supuesto, ya que ambos contratantes conocían del contrato de opción preexistente; por lo tanto, tenían la intención de causar el daño. El Art. 1227 del Código Civil, 31 L.P.R.A. sec. 3432, señala que *"'[l]os contratos sin causa, o con causa ilícita, no producen efecto alguno [y que es] ilícita la causa cuando se opone a las Leyes o a la moral."'* (Énfasis en el original.) *Serra v. Salesian Society,* 84 D.P.R. 322, 333-334 (1961). Es ilícita la causa cuando se opone a las leyes o a la moral [cuando se] trata de una lesión a un interés general de orden jurídico o moral. *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172, 182 (1985), Según Díez-Picazo, *"la causa ilícita puede ser de dos tipos: la causa ilegal, que se opone a las leyes, y la causa inmoral, llamada también 'causa torpe', que se opone a la moral y buenas costumbres. Es ilícita la causa no sólo cuando el contrato per se es prohibido, sino cuando mediante él se trata de ocasionar a otra un daño o un perjuicio ... cuando se pretende cometer un fraude...".* (Énfasis suplido.) Díez-Picazo, *Fundamentos del Derecho Civil Patrimonial,* op. cit., pág. 168. Dennis, *Metro Invs. v. City Fed. Savs., supra,* a la pág. 217.

En *Gen. Office Prods. v. A.M. Capen's Sons, supra,* págs. 558-559, discutiendo una figura de la interferencia con relaciones contractuales, se resolvió que la responsabilidad es de naturaleza extracontractual o cuasidelictual y se rige por sus términos. Véase también. *Dennis, Metro Invs. v. City Fed. Savs., supra,* págs. 220-221. Así pues, la responsabilidad de quien interfiere con el contrato es solidaria con la responsabilidad del contratante que lo inejecuta a sabiendas. Por lo tanto, resulta impertinente a estos efectos que el co-contratante del perjudicado haya tenido la intención de incumplir el contrato. Basta con que el tercero haya provocado o contribuido a la inejecución. En caso de concurrencia de culpas, la responsabilidad es solidaria. (Énfasis suplido.) *Id.*

Resuelto por el D.A.C.O., por lo tanto, que al constituir los contratos antes reseñados entre VLEI y Caribe un contrato en daño de tercero, donde ambos tenían conocimiento del contrato de opción existente entre VLEI y los recurridos, actuó correctamente al ordenar a Caribe, VLEI y SARI en forma solidaria el cumplimiento específico del contrato en controversia, bajo los términos allí pactados y a reservar la unidad separada u otra similar.

Plantea Caribe ▇ que no existía contrato entre VLEI y los recurridos, pues había sido rescindido éste, al momento de firmarse los contratos entre VLEI y Caribe. Añade que como VLEI no iba a terminar de construir las residencias opcionadas, no hubo daño por la otorgación de los contratos entre VLEI y Caribe. No le asiste la razón.

Nos reiteramos, en que estaba vigente el contrato de opción de los recurridos a la fecha de 6 de abril de 2004, cuando se firmó el contrato de opción de compraventa entre los recurrentes VLEI y Caribe. Tenga presente Caribe, que en el caso *Dennis, Metro Invs. v. City Fed. Savs., supra,* el Tribunal Supremo reconoció un contrato de opción verbal; a estos efectos, nos parece impropio cuestionar la existencia del contrato entre VLEI

y los recurridos. Nos referimos a la pág. 16 del recurso. No se cometió este error.

A D.A.C.O. no le mereció credibilidad el testimonio del ingeniero José Bonnín. El día de la vista, él indicó que las casas eran diferentes en cuanto a fachada, ventanas, puertas, losetas, cocina, solares, etc. Luego, indicó que no había preparado planos, que los sometería la próxima semana ante la agencia, que tenía que someter un proyecto alterno. Véase transcripción, a las págs. 170-174. Como correctamente determinó D.A.C.O., SARI y Caribe iniciaron la venta del proyecto sin previamente solicitar los permisos ni obtener la aprobación de los mismos, sin haber notificado a los residentes de Estancias de Golf Club dichas cambios o variaciones, todo ello en contravención de la ley y el Reglamento.

Cabe destacar que en el preciso momento de presentarse la querella, los contratos otorgados por los recurridos con VLEI y los recurrentes (VLEI y Caribe) eran similares y en derecho ambos constituian un contrato de promesa bilateral de compraventa como contrato preparatorio. Primero en tiempo, primero en derecho.

En el caso de autos, lo que hizo el D.A.C.O. fue decretar nulo los contratos otorgados entre VLEI y Caribe, única y exclusivamente en cuanto al solar AD-21, el opcionado por los recurridos. Con esta decisión devuelve a VLEI la titularidad para que cumpla lo prometido. Ello coincide con lo resuelto en *Dennis, Metro Invs. v. City Fed. Savs., supra,* y *Jordán-Rojas v. Padró-González,* 103 DPR 813 (1975). Le impone la responsabilidad a Caribe, como tercero culposo, no que construya la unidad, pues de todas manera tiene que construir 49 unidades, en virtud de los planos y los permisos adquiridos, sino que sólo recibirá por dicha construcción el precio originalmente pactado: $175,000.00 por la unidad DA-21 u otra similar. De los $50,000.00 faltantes responden los recurrentes solidariamente. Nos parece la solución menos onerosa y las más justa, prudente y de avanzada.

Resolver distinto, contribuiría a sostener que un vendedor de propiedades en masa, está facultado para seleccionar, conforme su mejor forma y criterio, a un comprador subsiguiente dejando al primero a las contingencias de un litigio en daños, que aun resultando a su favor, en la mayoría de los casos no compara con el beneficio de adquirir una propiedad en un mercado de valores espirales como es Puerto Rico. Ello se prestaría a distintas manipulaciones para obtener del fruto de la mala fe la cosecha del capital especulado. *Jordán-Rojas v. Padró-González, supra,* págs. 821-822. Concurrimos con la misma.

En cuanto al planteamiento de error sobre los daños concedidos por el D.A.C.O. a los recurridos por la suma de $4,000.00, entendemos que el mismo no se cometió. Los recurridos tienen derecho también al resarcimiento de daños. *Dennis, Metro Invs. v. City Fed. Savs., supra,* pág. 218. En segundo lugar, el D.A.C.O. está facultado para imponer compensación por daños y perjuicios. *Quiñones Irizarry v. San Rafael Estates, S.E.,* 143 D.P.R. 756, 770- 775 (1997). Abona a lo anterior que en la vista administrativa se pasó prueba de los daños y la determinación de D.A.C.O. a esos efectos significa que le mereció credibilidad el testimonio de la recurrida. Véase transcripción a las págs. 51-54. Además, la suma otorgada por este concepto no parece razonable.

No perdamos de perspectiva, que le debemos deferencia a dicha actuación de la agencia administrativa y a las interpretaciones que realicen de las leyes y reglamentos que les corresponde aplicar. A tenor con esta norma, este Tribunal debe evitar la intervención judicial con la interpretación de los reglamentos y leyes que les corresponda poner en vigor o velar por su cumplimiento al foro administrativo debido a su vasta experiencia, conocimiento y pericia sobre la materia. *García Oyola v. J.C.A.,* 142 D.P.R. 532 (1997).

La revisión de los organismos administrativos por los tribunales apelativos se limita a determinar si hubo actuaciones caprichosas, arbitrarias o irrazonables. *Misión Ind. P.R. v. J. P.,* 146 D.P.R. 64 (1998). No es ese el caso ante nos. Este Tribunal entiende que no ha mediado error manifiesto, prejuicio o parcialidad por parte de

dicho foro.

## IV

Por los fundamentos expuestos, se confirma la resolución del Departamento de Asuntos del Consumidor aquí recurrida.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones, Interina.

Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal de Apelaciones

**ESCOLIO 2006 DTA 110**

**1.** El tercer error planteado por Caribe, sobre la aplicación de la doctrina interferencias culposa por parte de D.A.C.O. no ocurrió. El caso de *Gen. Office Prods. V. A.M. Capen's Sons, supra,* fue citado por la agencia a los únicos efectos de establecer la responsabilidad solidaria entre los recurrentes; no utilizó los requisitos de esta figura jurídica para imponer responsabilidad. Véase el caso *Dennis, Metro Invs. v. City Fed. Savs., supra,* que versa sobre contrato en daño de tercero y donde se cita el primero a estos efectos y pertinencia. No se cometió este error.