TEXTO COMPLETO DE LA SENTENCIA
A solicitud de parte y por tratarse del mismo asunto, hemos decidido consolidar los recursos de apelación KLAN-2006-01636 y KLAN-2007-00214.
La compañía Intel de Puerto Rico Ltd. cerró operaciones permanentemente el 27 de julio de 2001. Los apelantes, Daniel Ramos Ayala y Richard Petrovich Martínez, eran empleados de la firma antes de esa fecha. Con vistas al cierre, Intel les propuso a todos sus empleados dos alternativas de beneficio “en el interés de facilitar la transición del empleado(a) de un empleo a otro”. La propuesta estaba en formato de contrato. El documento describe su contenido como “una paga por separación y beneficios a cambio de la firma y ejecución del presente Relevo General”. El contrato indica, inmediatamente, que “el empleado(a) reconoce que Intel no tiene la obligación legal de entregarle esta paga y beneficios por separación”. Las dos alternativas de beneficios consistían en la reubicación en una subsidiaria de Intel en alguna parte del mundo o beneficios financieros.
Don Daniel y don Richard optaron por los beneficios financieros. Eran éstos: “pago de salario base por seis meses, menos las deducciones requeridas por ley; y (b) pago de beneficios mejorados, de acuerdo a tiempo de servicio, según tabla; y (c) pago adicional para ayudar al empleado a comprar la cubierta de seguro de salud bajo COBRA por seis meses”. Según la tabla mencionada, dependiendo del número de años de empleo, recibirían entre 4 y 30 semanas adicionales de salario. A cambio de suscribir el contrato, los acogidos a sus beneficios relevaron a Intel de todas las demandas posibles al amparo de las leyes de Puerto Rico y Estados Unidos. En fin, se liberaba a Intel de “toda reclamación, alegación, acción, deuda, controversia, acuerdo, contrato, promesa y daños y perjuicios que el empleado(a), sus hijos, familiares, herederos, albaceas, administradores, cesionarios, sucesores en interés, apoderados, tutores y dependientes puedan tener al presente o haber tenido en el pasado”. En el documento, don Daniel y don Richard aseguraron que no teman *1188 ninguna reclamación pendiente y que ese “relevo general” no supone admisión de culpa o violación de ley alguna por parte de Intel. Nótese que no hay en la lista de posibles acciones relevadas alguna alusión a que se estén transigiendo daños físicos o emocionales, por lesión o enfermedad, sufridos por los empleados; al contrario, el empleado admite que no tiene reclamación de clase alguna en contra de Intel.
El acuerdo se formalizó con aprobación del Secretario del Trabajo y Recursos Humanos. Una vez suscrito, y pasados los días de reflexión dispuestos en el documento, Intel pagó el beneficio acordado y retuvo en el origen el 7% para el pago de contribuciones. Pero don Daniel y don Richard no incluyeron en sus planillas de contribución sobre ingresos la cantidad correspondiente al beneficio obtenido como parte de sus ingresos sujetos a contribución. El Departamento de Hacienda les notificó a ambos la deficiencia. Ellos demandaron al Departamento en el Tribunal de Primera Instancia. Hacienda pidió la desestimación al amparo de la Regla 10.2 de las de Procedimiento Civil, 32 L.P.R.A., Ap. Ill, R. 10.2.
Las juezas de instancia desestimaron sus demandas confirmando que don Daniel y don Richard tenían que pagar contribuciones por el beneficio recibido. Don Daniel y don Richard acuden ante este Tribunal alegando que erraron: (1) al resolver que las indemnizaciones otorgadas a trabajadores que renuncian a posibles causas de acción al amparo de las leyes laborales, constituyen ingreso tributable; (2) al desestimar una demanda cuyas alegaciones ni siquiera fueron negadas por la parte demandada y al hacerlo tan abruptamente, que los demandantes apenas tuvieron oportunidad de defenderse; y (3) al emitir una Sentencia que no fomenta la uniformidad en el trato a los contribuyentes.
I
Antes de abordar esos señalamientos, debemos poner en perspectiva asuntos de filosofía del derecho que invocan atención especialmente en este caso. Estamos en presencia de un valor de altísima estima dentro de nuestro ordenamiento jurídico. El trabajo es un medio por excelencia para expresar la personalidad humana. Personalidad y persona vienen del latín per sonare que significa suena a través. La esencia humana suena, se expresa de varios modos verbales o no verbales. Pero crece a través del trabajo esforzado. Cuando se valora el trabajo —cualquier tipo de labor, sea de interés pecuniario o altruista — , se dignifica al ser humano y su vida en sociedad.
Perder el trabajo es perder una parte tan básica de la humanidad como la comida, o la familia o la vida misma. En los tiempos del estado benefactor se dan por sentados todos esos elementos básicos; y hasta se desprecia el valor del trabajo. Eso contribuye a una cierta despersonalización, a una pérdida de la dignidad humana. Pero “la dignidad del ser humano es inviolable”, Art. II, Sec. 1, Const. ELA, Tomo 1, y estamos llamados, desde el ministerio judicial, a cuidar celosamente de ella.
El derecho al empleo o al trabajo “late” en nuestra Constitución. Así lo reconoció el Tribunal Supremo en Amy v. Adm. Deporte Hípico, 116 D.P.R. 414, 421-422 (1985):
“El derecho a un empleo, esto es, a devengar ingresos y a tener una vida justa y decente, es un principio inalienable al hombre, preexistente a la más antigua de las constituciones conocidas. El destino incierto de la frustrada Sec. 20 de nuestra Constitución, late entre aquellos derechos que aunque no se mencionan expresamente en el texto, el pueblo se reserva frente al poder político creado. ” Véanse: Constitución de Estados Unidos de América, Emda. Art. EX; Constitución del Estado Libre Asociado, Art. II, Sec. 19; Ortiz Cruz v. Junta Hípica, 101 D.P.R. 791, 794-795 (1973). 4 Diario de Sesiones, supra, págs. 2530-2532, 2539-2543, 2575-2577. En efecto, la Convención Constituyente tuvo muy presente expandir el alcance del concepto de “vida” como derecho inalienable del hombre. Uno de sus ilustres delegados, expresó en aquella ocasión la siguiente visión:

“...La palabra “vida” contiene toda una serie de derechos aparte, de la simple respiración, que no están 
*1189
incluidos necesariamente en la palabra “libertad" ni en la palabra “propiedad”. O sea, de eliminarse la palabra “vida” de esta frase tan consagrada en la historia de este gran derecho, se estaría haciendo un cambio fundamental en cuanto [a eso], principalmente ahora que se está expandiendo el área de los derechos humanos y ahora que se está reconociendo una segunda carta de derechos a la anterior clásica, tipo siglo XVII, y se están significando como derechos del hombre también en este documento, el derecho a la educación, el derecho al trabajo, el derecho a un nivel adecuado de vida. Todos estos derechos que abonan y que son necesarios para el debido desenvolvimiento de la personalidad humana están comprendidos fundamentalmente en la palabra “vida”.

A ese valor de tan alta jerarquía se opone, en este caso, el interés común que atiende el gobierno con sus recaudos de impuestos. No es despreciable ese valor, por más molestias que cauce en la primera quincena de cada mes de abril. Sin fisco no hay servicios, ni justicia social o distributiva. Por eso, un caso en que se atiende el trato contributivo que debe tener una indemnización por la pérdida de un empleo, no es uno fácil que pueda ser atendido con un mero análisis formal de normas aplicadas a hechos. Hay que enfrentar y no eludir el choque de esos valores; buscar su posible armonización; y si no es posible armonizarlos, hay que decidir cuál prevalece.
El formalismo jurídico no es la pauta de hermenéutica universal. El Tribunal Supremo lo pautó hace más de cuarenta años, por la pluma del Juez Asociado Marcos Rigau. Citando a Pablo de Tarso —“la ley sola mata más, el espíritu vivifica” — , castigó “un formalismo lógico, pero de poca realidad, manera de adjudicar ya universalmente rechazada”. Acogió las enseñanzas vitalistas de filósofos como el alemán Rodolfo von Ihering, los norteamericanos Holmes y Cardozo, el francés Geny y los españoles —muy citados en nuestra jurisdicción — , Castán, Puig Brutau y Hernández Gil. Sales v. Samac Motor Corp., 92 D.P.R. 529, 540 (1965). “Las tendencias teleológicas y vitalistas iniciadas por Rodolfo von Ihering, son hoy patrimonio del derecho universal” añadió el Tribunal Supremo en Oyóla Solis v. Registrador, 109 D.P.R. 756. 760 (1979).
Antes de Sales v. Samac Motor, supra, en Borinquen Furniture v. Tribunal de Distrito, 78 D.P.R. 901, 905 (1956), fundamentado en esa misma filosofía jurídica —y citando a Castán — , ya el Tribunal Supremo por voz del Juez Asociado, Lino Saldaña, había instruido que:
“(A)unque la interpretación es arte y no ciencia y ninguna teoría jamás proporciona una receta infalible para establecer el sentido correcto y preciso de las leyes, no es menos cierto que[...](e)l más destacado y fundamental resorte de la interpretación racional es el elemento tele ológico, derivado delfín de la ley ]...](y) a que ésta[...](e)s siempre medio para obtener un fin y, por consiguiente, ha de ser interpretada [...] atribuyéndole el sentido que mejor responda a la realización del resultado que por ella de quiere obtener]...]. (L)a verdad es que el análisis de los motivos y finalidad de la norma jurídica supone una delicada y compleja apreciación de intereses prácticos y de ideales éticos y culturales. Sobre todo exige ahondar en las realidades de la vida, en sus exigencias económicas y sociales. Y en esta idea fundamental están conformes los representantes de las más opuestas escuelas. ” (Énfasis nuestro)
Esas tendencias de pensamiento jurídico fueron compendiadas por el mexicano Luis Recaséns Siches, quien fue profesor distinguido visitante en la Facultad de Derecho de la Universidad de Puerto Rico. En su Nueva filosofía de la interpretación del derecho, 3ra. ed., México, Ed. Porrúa, 1980, pág. 41, nos explica el teleologismo de von Ihering:

“En contra de la idea que preside la jurisprudencia conceptualista, de que hay un mundo de conceptos propios, con contenido determinado, elaborados a priori y sin contradicciones, mundo en el cual podría encontrarse la regla suprema para el ordenamiento jurídico, Ihering sostiene que los contenidos de las normas jurídicas son de índole alógica. ”

En su famosa obra El fin en el Derecho, Ihering afirma rotundamente que “el fin es el creador de todo *1190 Derecho; que no hay norma jurídica que no deba su origen a un fin, a un propósito, esto es, a un motivo práctico.”
Según Ihering, el Derecho no es la cosa más alta que haya en el mundo, no es un fin en sí mismo. Es solamente un medio al servicio de un fin. Este fin consiste en la existencia de la sociedad. Si parece resultar que la sociedad no puede subsistir bajo el régimen jurídico dominante en un cierto tiempo, y si el Derecho no se muestra capaz del cambio necesario para que la sociedad pueda mantenerse en forma adecuada, entonces es la fuerza la que entra en acción para abrir el camino a un nuevo orden jurídico, que se muestre como medio eficaz y apropiado para realizar aquel fin.
Hasta aquí está dicho que el derecho que se individualiza en la jurisdicción caso a caso, tiene que ser un medio al servicio de valores que enaltezcan nuestra vida social. Von Ihering nos advierte que si no lo es, pierde su misión y se impone la fuerza. La fuerza no siempre es constructiva; podemos tomar conocimiento de ello por el impacto de la inestabilidad social en estos tiempos aciagos. Nuestro régimen jurídico tiene que traer a la luz y hacer verdad los valores centrales de nuestra vida de pueblo, como lo es, en este caso, el trabajo. Explicitarlos y enaltecerlos, es decir, reconocerlos, acentuarlos, vitalizarlos, dignificarlos. Apostar por ellos. Cuidarlos. Preferir los que nos hacen crecer —la vida sana, la familia, la naturaleza, repetimos: el trabajo, entre otros— frente a opciones que nos disminuyen, como por ejemplo, la dependencia. Ha dicho el Tribunal Supremo en Col Ing. Agrim. P.R. v. A.A.A, 131 D.P.R. 735, 756 (1992):

“Las leyes hay que interpretarlas y aplicarlas en comunión con el propósito social que las inspira, sin desvincularlas de la realidad y del problema humano que persiguen resolver. ”

El análisis jurídico debe tener tres niveles y no uno ni dos. En el primero se estudia la letra de la ley, siempre ambigua por la torpeza de las palabras y su carácter manipulable. Hay pleitos porque hay más de una interpretación posible de la ley o de su aplicación a hechos concretos. No hay texto de ley que pueda contener en sus hipótesis fácticas, la infinita variedad de hechos que puedan surgir en la vida social. Por eso, el análisis jurídico se eleva a un segundo nivel de doctrinas científicas o jurisprudenciales. El precedente y el análisis de comentaristas pueden arrojar luz sobre la conjugación de hechos y derecho con la justicia en cada caso. Pero las doctrinas se escriben también con palabras; adolecen del mismo defecto de ambigüedad que los textos legales; y el asunto es más complicado aun por la diversidad del pensamiento humano que propone ante cualquier asunto múltiples alternativas. De allí que el buen análisis jurídico deba ascender a un tercer nivel: el de los fines, diría von Ihering en su propuesta de análisis teleológico; el de los valores, diría Recaséns, en su propuesta de análisis axiológico. Se trata de adoptar lo que llama el filósofo brasileño Roberto Mangabeira Unger, un “policy oriented legal discourse” que nos obliga a hacer “explict choices among values”, Law in Modern Society, Free Press, New York, 1976, pág. 195.
No llegar a ese tercer nivel de análisis puede en ocasiones hacer la diferencia entre una justicia meramente formal y la justicia sustancial. Allí se manifiesta la verdadera razón por la cual escogemos entre las interpretaciones posibles de un texto o entre las diversas tendencias doctrinales. En ese tercer nivel, los valores atrincherados en doctrinas, nunca antes sujetas a un análisis crítico, se encuentran —por decirlo de un modo coloquial — , “con el cura de su pueblo”. Interpretaciones tradicionales y conservadoras reciben el “baño de ácido cínico” que propuso Oliver Wendell Holmes. Véase Recaséns, supra, pág. 44.
Este caso nos obliga a ese enfoque. Por eso comenzamos por exponerlo. Estamos ante una controversia de estricto derecho sobre un mismo texto legal que adolece de ambigüedad. No hay, en realidad, controversias de hechos. Los argumentos de ambas partes identifican doctrinas opuestas. Nos corresponde la juris dictio, decir el derecho. Cada una de las vertientes doctrinarias responde a valores. Estos son, de una parte, la indemnización por el trabajo perdido y su potencial de facilitar el tránsito a un nuevo empleo o auto empleo; y, de la otra parte, el bien común que el gobierno atiende a través del recaudo de contribuciones.
*1191 II
El Código de Rentas Internas, en su definición general de ingreso bruto, incluye “beneficios e ingresos derivados de cualquier procedencia”, 13 L.P.R.A., see. 3822 (a). Sólo excluye en sus formas escritas, en lo que aquí se plantea, “el monto de cualquier indemnización recibida, en procedimiento judicial o en transacción extrajudicial, por razón de (...) lesiones o enfermedad’, 13 L.P.R.A., see. 3822 (b) (5). El Código no exime del ingreso sujeto al pago de contribuciones, en su letra, en su texto, más indemnizaciones que esas. Exime en su letra, como veremos, las indemnizaciones por despido injustificado de la retención en el origen, pero no las exime de tributación. Esa ambigüedad del texto es la que genera aquí la controversia.
En Robles Ostolaza v. U.P.R., 96 D.P.R. 583, 595 (1968), el Tribunal Supremo afirmó: “Como se sabe, las sumas recibidas por concepto de indemnización por daños no son ganancia y no están sujetas a la contribución sobre ingresos.” Pero no se trató allí de una pauta normativa en el contexto del derecho tributario. Allí, el Tribunal Supremo debió determinar si las indemnizaciones por daños eran gananciales o privativas dentro del régimen de la sociedad legal de bienes gananciales. Resolvió que la indemnización “por daños físicos y morales es un bien privativo", pág. 597; es decir, que no es ganancia del matrimonio. Citó la ley de contribuciones como uno de sus fundamentos; hizo una mera referencia, específicamente, a la excepción de indemnizaciones por lesión o enfermedad que entonces estaba en 13 L.P.R.A. 3022(5), según consta en la nota al calce 24 en la página 595 de ese precedente. Pero en lo que se refiere a la extensión del tratamiento contributivo que tiene tal indemnización, la expresión es un obiter dictum. No tiene más alcance que su base legal en la nota al calce que acompaña la citada expresión.
La excepción de indemnización por lesión o enfermedad fue interpretada restrictivamente, diez años después de Robles, en un caso de derecho contributivo. En Publio Díaz v. E.L.A., 106 D.P.R. 854, 869 (1978), el Tribunal Supremo se negó a extender la excepción al lucro cesante. Explicitó:
“Cuando en una acción se indemniza el lucro cesante, éste es un elemento de daño que se concede porque las actuaciones del demandado ocasionaron una interrupción y cese de ingresos. Propiamente hablando, no es una indemnización por lesiones o enfermedad, ya que éstas tienen el propósito básico de restaurar el daño físico causado, pero como no puede hacerse en especie, se sustituye con dinero. Robles Ostolaza, v. U.P.R., 96 D.P.R. 583 (1968). Bajo este razonamiento, la indemnización por lesiones o enfermedad no constituye ingresos, y en el diseño fiscal prevaleciente, es de justicia que la Ley de Contribuciones sobre Ingresos asilo reconozca. Pero la indemnización del lucro cesante causado por una lesión o enfermedad, no tiene como objetivo el restituir o sustituir la integridad física de la persona. Sustituye ingresos provenientes del trabajo, que son tributables. La Ley de Contribuciones sobre Ingresos no exime la indemnización del lucro cesante del pago de contribuciones. Esta interpretación guarda correspondencia con la regla de hermenéutica que dispone que las exenciones y deducciones contributivas se interpretan restrictivamente: PARDAVCO, Inc. v. Srio. de Hacienda, 104 D.P.R. 65, 73 (1975); West India Mach. v. Srio. de Hacienda, 89 D.P.R. 115, 125 (1963); Descartes, Tes. v. Tribl. de Contribuciones y Ortiz, 73 D.P.R. 491, 497 (1952). Es razonable concluir que tanto el ingreso derivado del trabajo, como su sustituto en indemnización, son ingresos tributables. ” (Énfasis nuestro).
Dicho de otra forma, para que aplique a un caso la excepción por lesión o enfermedad tendríamos que estar en presencia de una transacción, no de cualquier daño, sino de daños sufridos; otros “sustitutos en indemnización serían tributables. Pauta Publio Díaz que “las de deducciones contributivas se interpretan restrictivamente”.
En este caso estamos en presencia de: (1) un beneficio otorgado “en el interés de facilitar la transición del empleado(a) de un empleo a otro”', (2) como “una paga por separación y beneficios a cambio de la firma y ejecución del presente Relevo General”', (3) donde “el empleado(a) reconoce que Intel no tiene la obligación legal de entregarle esta paga y beneficios por separación”', y donde reconoce además que (4) no tenía *1192 reclamación alguna pendiente y que ese “relevo general” no supone admisión de culpa o violación de ley alguna por parte de Intel. Interpretada, restrictivamente, la deducción por lesión o enfermedad, no le aplica porque no hay daño sufrido, sino “sustitutos en indemnización”. Esto dispone de la argumentación de los apelantes sobre esa excepción en particular. No es en ese contexto que tenemos que abordar las dos posibles vertientes de interpretación, con sus respectivos valores.
III
Se nos plantea que la indemnización que se otorga al amparo de la Ley 80 de 30 de mayo de 1976, 29 L.P.R.A., sec. 185a, no sea tributable. La Ley 80 fue enmendada en 1982 para disponer que la mesada no esté sujeta a ningún tipo de descuento de nómina, 29 L.P.R.A., sec. 185j. También la ley de contribución sobre ingresos se enmendó en 1987 para conformarla a la citada enmienda de la Ley 80. A partir de esa fecha se exceptúa de la retención de ingresos en el origen la “indemnización en casos de despidos en que no haya mediado justa causa”, 13 L.P.R.A., sec. 8541(a)(1)(G). Sobre las enmiendas de las leyes citadas, se construye la propuesta de que la indemnización de Ley 80 esté exenta del pago de contribuciones porque así lo quiso el legislador.
El Departamento de Hacienda nunca ha adoptado esa propuesta. En sus normas interpretativas establece que la indemnización de Ley 80 es tributable. Se funda en Flax v. Tesorero, 76 D.P.R. 390, 395 (1954), que pautó que “todo ingreso es tributable a menos que esté específicamente excluido” por otras disposiciones del Código de Rentas Internas. Como la exclusión dispuesta por Código es de la retención en el origen y no del ingreso, Hacienda entiende que la mesada no está exenta de tributar. La postura de Hacienda es que eso no se puede hacer porque según Flax, la exención no se otorgó específicamente. Pero esa postura responde a una postura filosófica del más extremo formalismo. Responde a una lógica estrictamente formal, no a una teleología o axiología. Dicho según lo pondría von Ihering, deja la enmienda desprovista de sentido o motivo práctico.
No contamos con una expresión autorizada en una exposición de motivos de las leyes de 1982 y 1987 antes referidas en cuanto a este asunto. En ausencia de esa expresión legislada, tenemos que inferir la finalidad. Podemos, de entrada, inferir que el propósito legislativo al eximir del descuento de nóminas la indemnización por Ley 80, no puede haber sido para desfavorecer a los obreros; para ponerles a riesgo de penalidades por no tener con qué pagar las contribuciones del año en que reciben la indemnización. Tiene que haber sido un propósito que les fuera favorable. Uno conforme con la exención de la retención en el origen dispuesta por ley; una finalidad que les asegure aprovechar el dinero recibido para recuperarse económicamente; o retrasar su entrada en la dependencia del seguro por desempleo. Un propósito que facilite el tránsito del empleado despedido a un nuevo empleo o autoempleo, que es el fin de la Ley 80. Véase la Exposición de Motivos de la Ley 80, 1976, Leyes de Puerto Rico, pág. 268; Díaz v. Wyndham Hotel Corp., 155 D.P.R. 364, 375 (2001). Tiene que ser una finalidad que evite, por ejemplo, la inflación de la tasa contributiva que le aplique al empleado despedido en ese año contributivo, por causa de la indemnización; y que no vaya a condenarlo —¡por ley!— al riesgo de penalidades por no tener con qué pagar las contribuciones.
Genovevo Meléndez Carrucini, en su Ingreso no tributable, exclusiones y doctrinas, San Juan, Instituto de Contribuciones de Puerto Rico, 1994, pág. 558, opina:

“La actuación de la legislatura al aprobar el referido inciso (H) en el 1987 [hoy es el inciso (G)] unida a la enmienda ya explicada también que se introdujo en el año 1982 a la Ley de Mesada para disponer que las compensaciones recibidas bajo la misma no estuviesen sujetas a ningún descuento de nómina, parecen ser más armónicas con la intención legislativa de no considerar ingreso la partida. ”

Según von Ihering, “no hay norma jurídica que no deba su origen a un fin, a un propósito, esto es, a un motivo práctico.” La única finalidad que pudo tener la enmienda a la ley contributiva contenida en la Ley Núm. 2 de 6 de octubre de 1987 es eximir la indemnización de la Ley 80 del pago de contribuciones. Pero esto no *1193 resuelve el caso de los aquí apelantes.
IV
La mesada es de carácter “reparador” porque indemniza por un acto torticero o injusto de un patrono que despide, sin justa causa, a un empleado. En Alvira v.FK & F Laboratories Co., 142 D.P.R. 803, 808 (1997), el Tribunal Supremo halló ese carácter en el texto mismo de la enmienda a la Ley 80 que fue sancionada en 1982: “no se hará descuento alguno de nómina sobre la indemnización dispuesta”. (Énfasis suplido por el Tribunal Supremo) Y también halló el carácter reparador en la exposición de motivos de la Ley 80 tal cual fue aprobada originalmente en 1976: “Ya es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenencia de un empleo mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado desaliente la incidencia de este tipo de despido”. (Énfasis en la decisión). Por eso pautó nuestro más alto foro judicial:

En la citada disposición de la Ley Núm. 80, supra, clara e inequívocamente se indica que la compensación a la que tiene derecho todo empleado despedido injustificadamente constituye una indemnización para resarcir los daños sufridos a consecuencia del despido. Esta indemnización no equivale a una remuneración o salarios por los servicios prestados ni constituye un sustituto del sueldo. ”

El Tribunal Supremo resuelve allí que la indemnización que recibe un empleado que ha sido despedido injustificadamente según la Ley 80, no es salario para fines del descuento, o retención en el origen, de la contribución debida por concepto del seguro social federal. El Tribunal Supremo no ha resuelto a esta fecha que no sea tributable al amparo del Código de Rentas Internas. Se nos pide que lo hagamos nosotros como lo hizo un panel hermano de este Tribunal en García Pérez v. Secretario de Hacienda, KLAN-2001-00885. Está claro que este Tribunal de Apelaciones no sienta pautas normativas, aunque nuestras sentencias puedan ser citadas “con carácter persuasivo”, Ley de la Judicatura de 2003, 4 L.P.R.A., sec. 24x. Por lo tanto, no puede reclamarse —como lo hacen los apelantes en sus respectivos alegatos — , que estemos obligados a implantar esa decisión en aras de la igualdad en el trato contributivo.
Hemos visto que el Departamento de Hacienda entiende que su ley orgánica no exime del pago de contribución sobre ingresos la indemnización por no decirlo específicamente. Y hemos resuelto que esa interpretación deja a la norma desprovista de sentido práctico. Pero, aún así, debemos dar deferencia a la agencia en la interpretación de sus propias leyes. Tormos & D.A.C.O. v. F.R. Technology, 116 D.P.R. 153, 160 (1985). Para hacerlo debemos optar por una interpretación restrictiva según Publio Díaz v. E.L.A. La exención de retención en el origen otorgada a la indemnización de Ley 80 en el Código de Rentas Internas se limita a “despidos en que no haya mediado justa causa”. Debemos limitar la exención de las indemnizaciones de Ley 80 a aquéllas en que —por sentencia o transacción — , se establezca que el despido fue injustificado. Así lo entiende también Meléndez Carrucini, op cit., a la pág. 557. Pero tenemos que abordar esta posibilidad a la luz, no sólo del texto legal, la doctrina y los valores que subyacen en la controversia. Para eso debemos también mirar los hechos.
Intel decidió cerrar operaciones en Las Piedras. Le propuso un “Relevo de Reclamaciones” a los apelantes Ramos Ayala y Petrovich Martínez. El acuerdo no divulga la razón por la cual el patrono cierra el taller de trabajo. Por el contrario, exige que se mantenga “bajo estricta confidencialidad!\ El patrono quiso controlar y liquidar sus múltiples responsabilidades legales posibles ante los empleados cesanteados. Utilizó el método de años de servicio según la Ley 80 para computar la indemnización. A cambio, a lo que único renunciaron los empleados fue a reclamar contra el patrono judicialmente cuanto derecho laboral le conceden las leyes estatales y federales. Esos son el objeto y la causa del contrato: la renuncia a demandar por el despido a cambio de una indemnización similar a la Ley 80. Fue un típico contrato de transacción de Ley 80.
Para determinar si se trata o no se trata de un despido injustificado hay que acudir a la ley y la doctrina *1194 laboral, donde el término se define. La ley contempla los despidos que son por justa causa en su Art. 2, 29 L.P.R. A. 185b. Pero es norma reiterada que todo despido o cese en el empleo se presume injustificado y corresponde al patrono probar lo contrario. Véase Delgado Zayas v. Hosp. Int. Med. Avanzada, 137 D.P.R. 643, 650 (1994), Srio. del Trabajo v. I.T.T., 108 D.P.R. 536, 546-547 (1979).
Intel, en este caso, optó por no atacar la presunción controvertible y procedió a la transacción económica de su responsabilidad. Bajo estas condiciones, la presunción de la doctrina laboral persistió. En la medida de que los. empleados aceptaron y recibieron indemnización por la terminación de sus empleos, no puede decirse que renunciaron a la presunción de ley en caso de que ello fuera permisible. Cf. Arthur Young & Co. v. Vega III, 136 D.P.R. 157, 167 (1994). Lo que los empleados transigieron fueron los efectos económicos de un “despido injustificado” al amparo del ordenamiento laboral en Puerto Rico.
La ley tributaria define salario como “remuneración por servicios prestados”, lo que incluye sueldo, comisión, vacaciones, pensión, Publio Díaz v. E.L.A., supra, págs. 869-870 (1978). Excluye, según hemos visto, la retención en el origen de una “remuneración (...) por concepto de indemnización en caso de despido en que no haya mediado justa causa según se dispone en las sees. 185 et seq. del Título 29, según enmendadas” que es la Ley 80. De igual manera, la Ley 80 dispone: “No se hará descuento alguno de nómina sobre la indemnización dispuesta por las secs. 185a a 185m de este título, debiendo el patrono entregar íntegramente el monto total de la misma al empleado.” 29 L.P.R.A. 185 j. Nos faltaba resolver, en una interpretación restrictiva de esos textos, si a la luz de los hechos de este caso, la indemnización es tributable porque medió justa causa. Resolvemos que hubo un despido que se presume injusto, pues el patrono transigió el asunto a cambio de un relevo de responsabilidad.
V
Indicamos que es ésta una controversia de estricto derecho sobre la aplicación de un texto legal que adolece de ambigüedad. Vimos cómo los argumentos de ambas partes identifican doctrinas opuestas que sostienen sus puntos de vista. Nos corresponde, al final, la juris dictio, decir el derecho aplicable a los hechos. En este caso, al nivel más profundo, se enfrentaron dos valores: dé una parte, la indemnización por el trabajo perdido y su potencial de facilitar el tránsito a un nuevo empleo o auto empleo; y, de la otra parte, el bien común que el gobierno atiende a través del recaudo de contribuciones. Pero la interpretación que acoge el valor del bien común al que el erario sirve, no alcanza a damos otro motivo que no sea el de tributar todo lo que sea posible, aunque lo desaconseje su valor social o la justicia. Tomamos conocimiento judicial de que el Estado ya tributa estas indemnizaciones al descontarlas de los beneficios que otorga el seguro por desempleo.
Según la filosofía del derecho que nuestro más alto foro judicial declara patrimonio universal, el derecho que se individualiza en la jurisdicción caso a caso, tiene que ser un medio al servicio de valores que enaltezcan nuestra vida como pueblo. Tuvimos pues que traer a la luz y hacer verdad que, en este caso, estamos en presencia de uno de los valores centrales de nuestra vida de pueblo, el trabajo. Puestos a escoger entre una interpretación que merma la indemnización concedida por ley para reparar la pérdida de un derecho de tan alta jerarquía y otra que la lleva a alcanzar su mayor fruición posible, encontramos la que más nos hace crecer como sociedad; la que cuida el valor del trabajo y su relación con el carácter inviolable de la dignidad humana y con la vida misma; la que alcanza su “motivo práctico” al decir de von Ihering. Entendemos que ese debe ser el alcance de la pauta normativa de Alvira v. SK & F. Laboratories Co., supra:
La sabiduría de dicha disposición está enmarcada dentro del propósito reparador que inspiró la aprobación de la Ley Núm. 80, supra: “Ya es tiempo que se proteja de una forma más efectiva el derecho del obrero puertorriqueño a la tenenciá de un empleo mediante la aprobación de una ley que a la vez que otorgue unos remedios más justicieros y consubstanciales con los daños causados por un despido injustificado desaliente la incidencia de este tipo de despido.”(...) Esta indemnización no equivale a una remuneración o salarios por los servicios prestados ni constituye un sustituto del sueldo. “La suma a que tiene derecho un empleado que ha sido despedido injustificadamente de su empleo al amparo de la Ley Núm. 80, supra, constituye una indemnización, lo *1195 qiie legalmente se define como un resarcimiento de daños y/o perjuicios, razón por la cual la misma no constituye salarios.”
Por los fundamentos expuestos, se revocan las sentencias apeladas.
Lo acordó el Tribunal y lo certifica la Secretaria.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones